PER CURIAM.
Robert Earl Peterson appeals his conviction and sentence of death for the August 8, 2005, first-degree murder of his 64-year-old stepfather, Roy Andrews. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm the convictions for first-degree murder and tampering with evidence and affirm his sentence of death for the murder.
FACTS
Peterson, who was 41 at the time of the crime, had been living at home with his mother and his stepfather. Andrews had been Peterson’s stepfather since Peterson was fifteen. Shortly before the murder, Peterson’s mother, at the urging of Andrews, told Peterson he had to move out. Also at Andrews’ insistence, Peterson’s mother stopped providing Peterson with money. Andrews was beaten and shot twice in Jacksonville, Florida, with his body left in the Greenlawn Cemetery very close to where Peterson’s ex-girlfriend was buried.

Guilt Phase Evidence

The State first presented evidence to establish that about a month before the murder, Peterson told several people that he was going to kill Andrews. In early July 2005, Peterson talked to Becky Price, his second cousin, and told her that Andrews had “kicked him out” and told his mother not to give him more money. Peterson informed Price that he was going to kill Andrews. About two weeks later, after his mother refused to give him money again based on Andrews’ direction, Peterson told Price a second time that he was going to kill Andrews. While the statements scared her, Price did not take him seriously and did not warn anyone. At the beginning of July, Peterson told his aunt that Andrews called his mother fat and that this made him “want to jump across the table and beat him to death.”
On August 7, 2005, Peterson was staying at a hotel, the Masters Inn, with his girlfriend, Clara Keene. At 6:01 a.m. on August 8, the security cameras at his hotel showed Peterson leaving his room wearing jeans, shoes, a jacket, and a dark hat with a design on it.
At the time of the murder, Andrews was a counselor at a local drug clinic, Jacksonville Metro Treatment Center, and gener *520 ally worked from 5:00 a.m. until 2:00 p.m. On August 8, 2005, Andrews arrived at 4:45 a.m. but left early at 9:30 a.m. Between 9 and 10 that morning, two people who worked close to Greenlawn Cemetery heard two loud pops that sounded like gun fire and then saw an older green pick-up truck with faded paint and big tires[1] leaving the cemetery very quickly.
Andrews’ body was found shortly after his murder. He was lying on the ground in a pool of blood, relatively close to the grave of Peterson’s ex-girlfriend who had died about a year earlier. Near the body, law enforcement found a dark “Bike Week” baseball cap, which matched the hat that Peterson wore when he left the hotel room that morning. Andrews’ truck was nearby, with the keys in the truck, the passenger door opened, and the hood of the truck released but not fully opened. Andrews’ wallet was still in his pocket, and he' had a considerable amount of money in his pocket. Andrews had been beaten around the head and shot in the head twice.
Around 10:30 a.m. that same day, Peterson called Keene at the hotel and asked her to let him into their room because he forgot his key. The video surveillance cameras showed Keene opening the door for Peterson. In the video, Peterson was dressed in different clothes from those he had worn when he left the hotel a few hours earlier: he was wearing a different shirt and not wearing an undershirt, shoes, or his hat. According to Keene, Peterson was upset and told her they needed to go to his mother’s house.
A few days after the murder, the police arrested one of Peterson’s acquaintances, Jimmie Jackson, for driving on a suspended license. While Jackson was in custody, he agreed to call Peterson to ask about the murder. During their initial conversations, Peterson made a number of incriminating statements, implying that he had killed Andrews as he had planned. Jackson set up a meeting with Peterson, agreeing to meet him in a parking lot. Peterson drove up in his vehicle at the designated time and then entered Jackson’s truck, which the police had wired.
During their conversation, Peterson admitted to killing Andrews and provided numerous details about the crime, including that he killed Andrews in broad daylight at 9:45 in the morning. Peterson explained that he killed Andrews because Andrews crossed the line by slapping his mother and calling her names. He then told Jackson that his mother knew about it because he and his mother were close and his mother was “contracting it.” Peterson informed Jackson that even though the police took his red truck, he was not in that vehicle during the crime. He bragged that the vehicle he did use was “crushed and gone” on the same day as the crime. He then described the murder in detail, explaining that he was walking down Emerson Road, as though his truck had broken down, and Andrews picked him up and took him to the cemetery. Peterson described the crime as follows:
PETERSON: No, I busted his ass with brass knuckles. I tried to beat him to death so’s I could take him somewhere else.
[JACKSON]: Oh, oh, oh, oh.
PETERSON: The bitch wouldn’t fucking — I done broke his jaw, knocked all his teeth out, his eye ball hanging out his fucking head, the bitch wouldn’t go out, so I had to go pop pop and haul ass.
*521 By that time, I’m covered from head to toe—
[JACKSON]: Blood.
PETERSON: So I hauled ass out way out to the west—
[JACKSON]: Yeah.
PETERSON: Hauled ass out to the fucking — got brain matter, the whole fucking nine yards. I went out to fucking Baldwin, stripped down, took a shower, scrubbed myself with a brush, got dressed, come back, still hit the cameras ....
[[Image here]]
PETERSON: Set all my clothes, all my clothes, the vehicle I was driving, and the gun, you’ll never find it. I don’t give a fuck who you are. You can be Inspector Cluso, you ain’t finding this shit. Drove back, and the man that I was working for says I was there from 9:00 to 11:00 and from 11:00 to 12:00. I eat lunch and from 12:00 to 1:00. I was sitting at my mama’s house when they came and informed us he got killed.
Peterson next discussed his former girlfriend, who was buried in Greenlawn Cemetery, telling Jackson that Andrews “landed on her grave.” Peterson also admitted that he made mistakes regarding some aspects of the plan because during the crime, there was a struggle and Peterson lost his hat and left some fingerprints in the truck.[2] He planned to explain this evidence by saying that he left his fingerprints when he was with Andrews the night before and Andrews had a nose bleed.
Dr. Jesse Giles, the medical examiner, testified that Andrews had a significant number of blunt force injuries spread over his head and neck that were consistent with brass knuckles and that occurred shortly before the time of death. Andrews’ cause of death was two contact gunshot wounds, where the gun was pressed against the victim’s head. One gunshot wound was at Andrews’ left temple. The other wound entered over Andrews’ right ear, and the bone fragments from this wound severed the brain stem, which was fatal.
After the State rested, Peterson testified in his defense, denying that he killed Andrews. Peterson testified that he had visited Bike Week one time, and while there, he bought about four Bike Week hats. According to Peterson, on the day before the murder, he went to his mother’s house to buy lottery tickets for her and saw Andrews sitting in his truck. Andrews had a trickle of blood coming from his nose, so Peterson helped wipe it away. He then left and bought the tickets as he planned to do. When he brought the tickets back to his mother’s house, he noticed the interior light of the truck was on, so he reached into Andrews’ truck and turned off the light, knocking off his hat. He did not reach down to retrieve his hat because he was in a hurry to return to his hotel room with his girlfriend.
Peterson further testified that on the day that Andrews was killed, he got up at 5:30 that morning and wore a jacket because it was very cold in the hotel room. He spent the morning on various errands and went to his mother’s house. Around 9 a.m., Peterson began to work on a siding project near his mother’s house. Shortly after he began, he realized that his phone was missing, so he left to find it. Peterson explained that the reason he was dressed differently when he arrived at his hotel room late that morning was because he had taken off his hat and left it at his mother’s house, along with his warmer clothes. He also was not wearing shoes because his shoes got dirty when he *522 walked through a yard during the siding project.
In explaining the incriminating statements that he made to Jackson, Peterson testified that near the time of the murder, he had a drug deal going on with Jackson, where he had “invested” $10,000 so that Jackson could sell the drugs and he could make a $4,000 profit. In an attempt to get his money back, he made up a story that he beat his stepfather so badly that he knocked out his eyeball and all of his teeth — something that was not even accurate as to Andrews’ actual injuries.
In his defense, Peterson also called Joel Sockwell, who testified that he lived near Peterson’s mother’s house. On the day of the murder, Sockwell went to work, but left around 9 a.m. and saw Peterson in the neighborhood while he was out on the patio. However, Sockwell was not certain about the times.
The jury found Peterson guilty of first-degree murder and tampering with evidence.

Penalty Phase Proceedings

During the penalty phase, the State presented four victim impact statements and relied upon the evidence already presented to establish the aggravators.
The defense presented numerous witnesses, most of whom lost contact with Peterson in recent years but testified that years ago, Peterson was a good worker and friend. Many of the witnesses who testified on Peterson’s behalf knew of Peterson’s involvement at the raceway where Peterson raced cars. For example, David Bradshaw testified that he had known Peterson since 1986, when they raced together. According to Bradshaw, during that time, Andrews and Peterson got along well and worked on cars together. However, Bradshaw did not have regular contact with Peterson during the last five years. During this period of time, Peterson was married, but he and his wife eventually divorced. A few witnesses testified that they speculated that Peterson might have become addicted to drugs after the divorce, but never actually witnessed Peterson use any illegal substances.
In addition, Peterson presented testimony to establish that he had not received any disciplinary reports since he was in jail. Peterson also called his aunt, Lá-veme Rundall, who testified that she likewise had once contemplated whether Peterson was under the influence of drugs when she saw Peterson outside of Andrews’ office at the Jacksonville Metro Treatment Center and did not recognize him because he was so scruffy and skinny. She asserted that Andrews and Peterson had a good relationship until recently, when they argued about money. On cross-examination, she asserted that Peterson obtained his truck and most of his money through his mother and Andrews.
Peterson’s mother, Patricia Andrews, also testified on his behalf, asserting that Peterson and Andrews were very close and previously were involved in racing together. At the time of the murder, Andrews had been Peterson’s stepfather for about eighteen years. According to Patricia, Peterson supported her significantly since she has chronic obstructive pulmonary disease and also provided a tremendous amount of support to Andrews when he was undergoing cancer treatment. They paid him for his help, including paying his child support and his truck insurance in exchange for his assistance. Andrews invited Peterson to live with them and told Peterson that if he was not working, they would find things for him to do around the house. On cross-examination, she admitted that Andrews recently had changed the arrangement, so that Peterson could not obtain money from one person without telling the other person. They tried to talk to Peterson about obtaining a *523 better job. The jury voted to recommend a sentence of death by a vote of seven to five.
During the Spencer[3] hearing, Dr. William Morton testified regarding the effect of Peterson’s cocaine, use on his decision to murder Roy Andrews. The judge sentenced Peterson to death. In doing so, the judge found three aggravators: (1) the murder was cold, calculated, and premeditated (CCP); (2) the murder was heinous, atrocious, or cruel (HAC); and (3) the murder was committed for pecuniary gain. Peterson did not offer any statutory mitigation, and none was found. The court found two nonstatutory mitigators: Peterson had a history of drug abuse, and he had numerous positive qualities.[4] The trial court sentenced Peterson to death, concluding that “[t]he three weighty aggrava-tors, when weighed against the two non-statutory mitigators, which were assigned only at best slight weight, support a death sentence.”
ANALYSIS
On appeal, Peterson raises eight claims: (1) the trial court erred in admitting a statement that could imply Peterson committed a prior murder; (2) the court erred in permitting the State to present certain victim impact evidence; (3) the court erred in denying the motion to suppress the statements that Peterson made to Jackson; (4) the court erred in finding CCP; (5) the court erred in finding the murder was committed for pecuniary gain; (6) the court erred in giving little weight to the evidence pertaining to Peterson’s cocaine addiction; (7) the death sentence is disproportionate; and (8) this Court should reconsider whether Florida’s death penalty scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In addition, although Peterson does not raise the issue, we review whether the evidence is sufficient to support Peterson’s first-degree murder conviction. See Jones v. State, 963 So.2d 180, 184 (Fla.2007); Fla. R.App. P. 9.142(a)(5).
Guilt Phase Claims

Admission of Statements That May Imply Peterson Committed a Prior Murder

In his first claim, Peterson alleges that the trial court committed fundamental error in permitting the State to play a portion of a secretly recorded conversation between Jimmie Jackson and Peterson that implied Peterson committed a prior murder. When Peterson confessed to his friend, Jackson, he also implied that he had killed his former girlfriend, Cheryl Greer, who was buried in Greenlawn Cemetery. Specifically, Peterson told Jackson that the police initially had accused Peterson of involuntary manslaughter by throwing Greer in front of a car that hit and killed her. He then told Jackson that Andrews landed on top of her grave and that he “stacked ‘em double.” Defense counsel filed a motion in limine and strenuously objected to the admission of the portions of the tape where Peterson indicated that he killed Greer. The State and defense counsel agreed to redact portions of the conversation where Peterson clearly implied that he was responsible for Greer’s *524 death, but defense counsel did not request that the statement regarding “stacking ‘em double” be redacted.
During the trial itself, the jury heard only Peterson’s statement that he “stacked ‘em double,” a phrase to which defense counsel did not object during the trial. Specifically, the jury heard the following:
PETERSON: Alright. The girl that got killed on Phillips Highway?
[JACKSON]: Yeah. I thought she might was just drinking, just wandered out there, god-damn. Well, then all, then all, then all, that’s, that’s what I thought, but by they saying [a] woman, an old lady hit her....
PETERSON: Yeah, well an old lady did hit her, but she tripped and fell in the fucking highway, didn’t she? And you know what? This man landed on her grave! O.K. I stacked ‘em double.
[[Image here]]
PETERSON: And I put one on top of her.
[JACKSON]: Uh, uh, that crazy ass name, uh, uh,
PETERSON: Cheryl. Yeah, yeah. Like I said, I ain’t got a problem with doing it. I’m just as cold-hearted as the next mother-fucker man.
In closing, the State referred to the phrase that Peterson “stacked ‘em double,” asserting that this showed that Peterson knew exactly where the murder occurred in the cemetery.
Peterson asserts that the trial court should have excluded the portions pertaining to the phrase that Peterson “stacked ‘em double” because it had so little relevance to Andrews’ murder and was extremely prejudicial by implying that Peterson had committed a previous murder. See § 90.403, Fla. Stat. (2009). He further contends that evidence regarding other uncharged crimes is admissible only if it fits under the provisions of section 90.404(2), Fla. Stat. (2009), contending that this does not apply here.
Specifically, section 90.403 provides, “Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.” § 90.403, Fla. Stat. Peterson recognizes that his counsel did not object, and thus the fundamental error standard applies. For an improper statement pertaining to a collateral crime to be considered fundamental error, the statement must be so prejudicial as to “reach[ ] down into the validity of the trial itself to the extent that a verdict of guilty or jury recommendation of death could not have been obtained without the assistance of the alleged error.” England v. State, 940 So.2d 389, 398 (Fla.2006) (quoting Doorbal v. State, 837 So.2d 940, 954-55 (Fla.2003)).
In reviewing the merits of the claim at issue, the statement itself that Peterson “stacked ‘em double” does not mean that he killed both Greer and Andrews — only that he killed Andrews and that his body landed on Greer’s grave. In fact, the jury heard other statements in which Peterson explained that Greer was killed when she fell down and was hit by a car that was driven by a woman. Moreover, while the prosecutor did use Peterson’s phrase “stacked ‘em double” during closing arguments, the prosecutor limited the use of this comment to argue only that the fact established Peterson knew exactly where Andrews’ body was located — the prosecutor did not imply that Peterson was responsible for Greer’s death as well. Even if the statement could be taken to imply that Peterson was responsible for Greer’s death, based on this record, this does not constitute fundamental error. See England, 940 So.2d at 397 (addressing a similar situation and holding that fleeting *525 statement by witness that the defendant “already got a murder charge” did not constitute fundamental error because this one statement was preceded by multiple days of other evidence that linked the defendant to the murder and the jury may have believed that this statement was referring to the murder of the victim involved in the case it was hearing).
Accordingly, we deny relief on this claim.[5]

Denial of the Motion to Suppress Statements That Peterson Made to Jackson

In his next guilt-phase claim, Peterson asserts that the trial court erred in denying a motion to suppress the statement he made to Jackson because he had been coerced and he had not been given his Miranda[6] warnings. The record reveals that the police suspected Peterson was involved in the murder almost immediately after the crime. A few days after the murder, the police arrested Jackson, one of Peterson’s friends, after Jackson ran a stop sign while driving on a suspended license. While he was in police custody, Jackson agreed to help the police by asking Peterson about the murder. The police searched Jackson’s vehicle and then wired it in order to record the conversation. Jackson called Peterson to set up a meeting, and they subsequently met at a Waffle House parking lot where Peterson made incriminating statements while in Jackson’s vehicle.
Prior to trial, defense counsel filed several motions to suppress the confession. In the initial motion to suppress, counsel asserted that Peterson’s confession to Jackson should be suppressed because his confession was coerced and false. Specifically, Peterson alleged that at the time of the confession, he noticed Jackson constantly reaching in between the driver’s door and the driver’s seat and thought Jackson was reaching for a gun. Peterson contended that he falsely confessed to killing Andrews in an attempt to scare Jackson. In a second motion to suppress, Peterson asserted that he was in custody at the time of the interrogation, was not allowed to leave, and had not been read his Miranda rights.
The trial court held a hearing on these two motions, during which the State offered the testimony of the officers who helped to set up the taped confession by hiding the recording devices in Jackson’s vehicle and monitoring the conversations while they occurred. Sergeant Bruce Baker testified that the police had searched Jackson’s vehicle before the meeting but found no weapons. They wired both Jackson’s vehicle and Jackson himself and then observed them without Peterson’s knowledge. Sergeant Baker was asked directly about Peterson’s claims of feeling threatened by Jackson:
[PROSECUTOR]: Are you aware that the defendant has alleged essentially that Mr. Jackson was constantly reaching for a firearm in between the driver’s door and the driver’s seat area of Mr. Jackson’s vehicle?
[BAKER]: Yes, sir.
[PROSECUTOR]: What can you tell the Court about the voracity [sic] or accuracy of that sort of claim based upon the evidence and the surveillance that you were aware of on the particular evening?
[BAKER]: That it’s impossible. This would be the third version of what happened.
*526 [PROSECUTOR]: I’m sorry, the third version? The defendant has made other claims relating to how it is he came to make those statements?
[BAKER]: Yes, sir.
[PROSECUTOR]: What other versions would that be?
[BAKER]: Well, the first one was he was intoxicated beyond belief and was rambling. And then he also told his former spouse that he was reading a script that was given to him.
[PROSECUTOR]: Okay. Would any of those be true either?
[BAKER]: No.
Sergeant Baker later asserted that when they arrested Peterson, Peterson was still in Jackson’s truck and did not tell the police that he feared Jackson had a gun.
The State also played the tape of the conversation in which Peterson confessed to Jackson. Throughout the tape, there was no indication that Peterson was hesitant to talk to his friend. When Jackson asked if Peterson needed any help to get rid of anything, Peterson replied:
No, it’s gone. All of that shit is gone. Everything is clean. They ain’t got no evidence. Okay. The only evidence they’ve got is a couple of motherfucking fingerprints, and them fingerprints are covered. They covered. Hey, ... I’m going to go fucking get locked up, but I got my ass covered. Okay. The best time I do is five.
After he told Jackson how he was being careful and how he disposed of the car he used on the day of the murder, he asked Jackson, ‘You want to hear the whole details? Can you handle it?” Although Jackson warned him that he had a weak stomach, Peterson then bragged about beating Andrews. At one point, Peterson asked Jackson if he was wired and when Jackson denied it, Peterson explained how he disposed of all the evidence, including the gun. Nothing on the tape indicated that Peterson was afraid or felt that he would be unable to leave Jackson’s truck. In fact, after Peterson confessed to the murder but before the police arrived, Peterson told Jackson that he was going to get a cigarette, and Jackson simply responded, “Okay.” Peterson decided not to testify at the hearing.
The trial court found that Peterson was not coerced and was not in custody at the time of the statement, making the following oral findings:
Well, based upon the motions and the testimony and applicable case law, number one, I find that the allegations of the defendant’s description of what happened here, vis-a-vis, the allegations in the narrative part of the two motions is totally contradicted by the testimony taken today and most particularly by the audiotapes that were made during this incident. There is absolutely nothing to indicate any intimidation by [Jackson] against Mr. Peterson. And if [Jackson] was reaching for a firearm in between the driver’s door and the driver’s seat area for the length of time that the defendant was talking on this tape, he could have clawed a hole in the upholstery much less have time to get a firearm out if that is what his intent was. It is just ludicrous to imagine that somebody is intimidated and goes on talking that long by such a motion.... It defies credibility and how that would have been intimidating in the absence of any actual evidence of or even testimony of the existence of a firearm, I don’t know.
... [I]t appears unquestionable to me that this is not a custodial interrogation. We have a person who is acting for the police, but he arranges a meeting with the defendant wherein it is clear that both the defendant is thinking that this is his friend or cohort and [Jackson] is pretending to be his friend or cohort. *527 There is nothing here indicating that the police had summoned the defendant for this meeting at all. It’s just devoid of anything to support that.
Number two, the purpose, place, and manner — the purpose was to accomplish the delivery of the potatoes and that was at the behest of the defendant and the place and manner are also pretty much determined by the defendant and Mr. Jackson, not by the police. The only thing that the police did was put the microphones in his car and drive him over there. It was all set up by [Jackson] and the defendant.
There is absolutely nowhere in any of the evidence I have heard today where the suspect was confronted with evidence of his guilt. It is just the opposite, really. He is conspiratorially giving evidence of his guilt without anyone even questioning him in many instances. And then whether the suspect is informed that he is free to leave the place of questioning, the tape ends with the defendant saying I’m going to get a cigarette. And he just gets up and goes. I don’t know what happened after that because we quit playing the tape. But it appears clear that he arranged this meeting, came to it freely, and was free to leave it at any time. And when he wanted a cigarette, he didn’t ask if he could go get one. He got up and went and got one.
The court then denied both motions to suppress. Peterson asserts that the trial court erred in its holding, but he is not entitled to relief relating to either motion.
In the initial motion to suppress, Peterson asserted that he was coerced into confession. However, on appeal, Peterson does not make any argument on this ground. Thus, he has waived this argument. See, e.g., Pagan v. State, 29 So.3d 938, 957 (Fla.2009) (holding that the “purpose of an appellate brief is to present arguments in support of the points on appeal” and failing to do so or merely referring to arguments made below will mean that such claims are deemed to have been waived (quoting Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990))). Moreover, there is no evidence to support the claim that Peterson felt coerced.
In the second motion to suppress, Peterson alleged that he was in custody and was being interrogated since Jackson was an agent of the police, and thus he was entitled to Miranda warnings, which were not given at this stage. The State concedes that Jackson was an agent of the police for purposes of this analysis.[7]
Under both the United States and Florida Constitutions, defendants cannot be “compelled” to be witnesses against themselves in any criminal matter. U.S. Const, amend. V; art. I, § 9, Fla. Const. This constitutional guarantee “is fully applicable during a period of custodial interrogation.” Ramirez v. State, 739 So.2d 568, 572 (Fla.1999) (quoting Miranda, 384 U.S. at 460-61, 86 S.Ct. 1602). However, police are not required to give Miranda warnings to every potential suspect — these warnings apply only to in-custody interrogations. Ross v. State, 45 So.3d 403, 414 (Fla.2010), cert, denied, — U.S. -, 131 S.Ct. 925, 178 L.Ed.2d. 803 (2011). We have adopted an objective, reasonable-person framework in determining whether a suspect was in custody. Id. at 415. The ultimate inquiry is twofold: (1) the “circumstances surrounding the interrogation”; and (2) “given those circumstances, *528 would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.” Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). To analyze the case-specific facts that are relevant to determining this issue, the Court considers the following four factors:
(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; [and] (4) whether the suspect is informed that he or she is free to leave the place of questioning.
Id. (quoting Ramirez, 739 So.2d at 574). The focus is on “how a reasonable person in the suspect’s situation would perceive his circumstances.” Id. (quoting Yarborough, 541 U.S. at 662, 124 S.Ct. 2140). As we have held,
when reviewing a trial court’s' ruling on a motion to suppress, “mixed questions of law and fact that ultimately determine constitutional rights should be reviewed by appellate courts using a two-step approach.” We defer to a trial court’s findings of fact as long as they are supported by competent, substantial evidence, but we review de novo a trial court’s application of the law to the historical facts.
Id. at 414 (quoting' Connor v. State, 803 So.2d 598, 605 (Fla.2001)).
In looking to the first factor, the manner in which Peterson was summoned, Peterson asserts that this factor was met because Jackson called Peterson to set up a meeting. This, by itself, does not' show that this factor was met. Peterson and Jackson were friends, and based on the telephone conversations, Peterson was extremely anxious to meet Jackson because he was trying to get the proceeds from a drug transaction that the two had worked on together. At the time of the conversation, Peterson had no knowledge that Jackson was helping the police:
Second, courts look to the purpose, place, and manner of the interrogation. Here, Peterson met Jackson in Jackson’s vehicle at a parking lot in plain view. While Jackson asked numerous questions concerning how Peterson committed the murder, the manner of their conversation does not show any type of pressure at all. Peterson and' Jackson were friends who were having a normal conversation, and Peterson clearly wanted to share the details of the murder with somebody, asking Jackson if he wanted to hear everything. Jackson exerted no pressure at all on Peterson. In fact, at times, Peterson told Jackson information about the murder that Jackson expressed he was hesitant to hear.
Third, courts review the extent to which the suspect is confronted with evidence of his guilt. Here, Jackson did not confront Peterson with any evidence of his guilt— instead, he simply asked for more details when Peterson discussed some portions of the .murder.
Finally, courts review whether the suspect is informed that he is free to leave. As recounted above in the trial court’s findings, nothing within the conversation between Jackson and Peterson shows that Peterson did not believe that he was not free to leave at any time. When Peterson told Jackson that he was stepping out to smoke, he did not ask permission, showing that Peterson felt free to leave. Moreover, while Peterson now alleges that he thought Jackson may have had a gun, as the trial court found, this was belied by their entire conversation. In addition, Peterson admitted to Jackson that he already disposed of his gun — something that he would not have done if he were truly worried that Jackson also had a gun.
Here, the trial court’s findings of fact are supported by competent, substantial *529 evidence. We hold that Peterson is not entitled to relief, and accordingly, we affirm the trial court’s decision to deny both motions to suppress.

Sufficiency of Evidence to Support the First-Degree Murder Conviction

In the final guilt-phase issue, we review whether the evidence is sufficient to support Peterson’s first-degree murder conviction. “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Bradley v. State, 787 So.2d 732, 738 (Fla.2001).
The record contains sufficient evidence to support Peterson’s conviction for the first-degree murder of Roy Andrews. The State presented evidence that Peterson told Price and Rundall that he would kill Andrews in the month leading up to the murder. The State further presented a tape-recorded conversation in which Peterson admitted that he killed Andrews, which constitutes direct evidence of Peterson’s guilt. See Simpson v. State, 3 So.3d 1135, 1147 (Fla.2009). This taped confession included numerous facts that the defendant could not have known unless he was involved in the crime, including the time and exact location of the murder and the injuries Andrews suffered. In addition, witnesses observed a truck leaving the scene that resembled a truck to which Peterson had access. At the scene, police found a hat that matched a hat Peterson was seen wearing only a few hours prior to the murder.
Based on a review of the evidence presented in this case, a “rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Bradley, 787 So.2d at 738. Thus, there is sufficient evidence to support Peterson’s first-degree murder conviction.
Penalty Phase Claims

Whether the Court Erred in Permitting the State to Present Certain Victim Impact Evidence

In his first penalty-phase claim, Peterson objects to three portions relating to several victim impact statements that were admitted. First, Peterson objects to the victim impact evidence that witness James Ross provided when he testified that Andrews was a police officer until he retired and had been a U.S. Army paratrooper. According to Peterson, this information is not permissible victim impact evidence because Andrews was no longer engaged in either of these activities at the time of his death so this did not establish a loss to the community.
The trial court properly held such evidence is permissible victim impact evidence. Under section 921.141(7), Florida Statutes (2009), the State may introduce victim impact evidence, which is limited as follows:
Victim impact evidence.—Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence to the jury. Such evidence shall be designed to demonstrate the victim’s uniqueness as an individual human being and the resultant loss to the community’s members by the victim’s death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as part of victim impact evidence.
See also Kormondy v. State, 845 So.2d 41, 54 (Fla.2003) (holding that victim impact evidence “is permissible, but is to be limited to the victim’s uniqueness and the loss to the community caused by the victim’s death”).
*530 Here, Ross testified that when Andrews was a law enforcement officer, he wanted to work in the most difficult part of the city because he felt he was needed more there and wanted to help. Ross further testified that Andrews’ experience as a U.S. Army paratrooper was consistent with his desire to always want to be one of the best. Testimony that Andrews was previously a law enforcement officer who tried to help others and preferred working in the most difficult areas of the city clearly is relevant to “demonstrat[ing] the victim’s uniqueness as an individual human being.” § 921.141(7), Fla. Stat. Thus, Peterson has not demonstrated error.
Second, Peterson objects to how the State used this information in its closing argument, asserting that the State im-permissibly contrasted Andrews’ exemplary life with Peterson’s self-indulgent life by emphasizing how Andrews lived a life serving and helping others and then told the jury: “Death is not the correct or appropriate recommendation because Roy Andrews is who he was. It’s the appropriate recommendation because Robert Earl Peterson is who he is.” Defense counsel did not object. Peterson has not established that this argument constituted fundamental error.
In Hayward v. State, 24 So.3d 17, 41-43 (Fla.2009), this Court held that the prosecutor exceeded the proper scope of closing argument when the prosecutor implied that the jury should compare the choices that the victim made with the choices that the defendant made. See also Wheeler v. State, 4 So.3d 599, 610 (Fla.2009) (holding that “victim impact evidence is not to be used by the jury to compare, contrast or weigh the relative worth of the life of the victim against that of the defendant”). After reviewing the closing argument in this case, we conclude that the statement here is not comparable to those in Hayward or Wheeler. Peterson has not shown error, much less fundamental error. Peterson is not entitled to relief on this claim.
In his last subclaim pertaining to this issue, Peterson challenges a statement in which the victim’s biological son, Wayne Andrews, made the following comment at the very end of his statement: “This was a senseless horrific murder. The crime deserves just punishment.” Peterson asserts that he is entitled to a new trial because this witness should not have asked for “just punishment.” Although defense counsel did not object at the moment that the statement was made, after the witness left the stand, defense counsel moved for a mistrial or in the alternative, for a curative instruction. Based on a discussion with counsel, the court provided a general curative instruction to the jury that did not specifically reference this comment, informing the jury that the victim impact testimony is allowed to show only the uniqueness of the victim and impact of his loss on society and that it was not to be taken as a recommendation of any type of sentence.
Peterson has not established that the comment at issue constitutes reversible error, especially in light of the court’s curative instruction. While victim impact evidence is not to include statements regarding the “appropriate sentence,” § 921.141(7), Fla. Stat., here, the statement said Peterson should be given a “just punishment.” To the extent that the jury may have believed that this statement supported a recommendation of death, the court explicitly informed the jury that it was not to consider any of the statements as recommending a particular punishment. Peterson has not shown reversible error.

Whether the Murder Was Cold, Calculated, and Premeditated

Next, Peterson asserts that the trial court erred in finding that the murder *531 was committed in a cold, calculated, and premeditated manner (CCP). When a capital defendant challenges the finding of an aggravator, this Court does not reweigh the evidence to determine whether the State proved the aggravating circumstance beyond a reasonable doubt. Aguirre-Jarquin v. State, 9 So.3d 593, 608 (Fla.2009). Rather, this Court’s task on appeal is “to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.” Id. (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)).
The trial court made the following findings:
The defendant threatened on numerous occásions to kill the victim. He even specifically stated to one person that he wanted to beat the victim to death. Statements were made to Becky Price, Láveme Rundall, Joel Soekwell, and Jimmy Jackson at various times. He borrowed a truck from his girlfriend to avoid having his truck seen during the murder. He scouted out a location in' a cemetery which was largely deserted at that time of day, and which, not coincidentally, was near the victim’s route home from work. He had to have made arrangements in advance in order to be able to burn, crush, and destroy the truck, gun, and bloody clothing used and worn in committing the murder. He bragged to Jimmy Jackson about completely disposing of these items immediately after the murder. It would not seem possible for a person covered with blood, brain matter, and gore to drive up to a commercial vehicle crushing business and ask to have his truck disposed of, without causing people to ask questions or at least recall the incident clearly afterward. Further, he told Jimmy Jackson he owed a man $3,000.00 for helping him dispose of the truck, and that he had to get that man out of town quickly. He prepared the plan to fake engine trouble to get the defendant to come to the cemetery and turn his back on the perpetrator.
He prepared for this deadly encounter by obtaining brass knuckles, a change of clothing, and a firearm in advance. In short, the defendant procured the means of killing, devised a plan for the killing, and carried it out as a matter of course without any pretense of legal or moral justification, and without any provocation whatsoever from the victim. The defendant also had ample opportunity to change his mind, cancel the plan, or release the victim, but instead, after substantial reflection, he acted out his conceived plan to murder his victim. The defendant’s statement to Jimmy Jackson that he killed Mr. Andrews because he called the defendant’s mother fat does not constitute even a pretense of legal or moral justification for murder.
As an initial matter, the State asserts that this claim is procedurally barred because Peterson challenged this aggravator in a different manner to the trial court. In support, the State cites to Buzia v. State, 926 So.2d 1203 (Fla.2006). However, Buzia involved a question of law — not a factual challenge to a sentencing order’s findings of fact. See id. at 1208-09. Specifically, in Buzia, the defendant made a legal challenge as to whether the prior violent felony aggravator was supported because his contemporaneous guilty verdict for the attempted murder of another victim was not a “conviction” under section 921.141(5), Florida Statutes (2003). Buzia, 926 So.2d at 1208-09. This Court held that the legal question was not preserved for appeal. Id. at 1209.
Buzia is distinguishable from the situation at hand since Buzia addressed a legal *532 question, while the question in this case involves a factual determination. See also Walls v. State, 641 So.2d 381, 887 (Fla.1994) (requiring a defendant to raise a legal challenge to a jury instruction on an aggravator before raising such a challenge on appeal); Davis v. State, 703 So.2d 1055, 1060 (Fla.1997) (holding that the defendant failed to preserve the legal question as to whether the judge could consider an ag-gravator initially presented in a sentencing memorandum that was not first submitted to the jury). However, we have not imposed such a requirement before a defendant can challenge a trial court’s factual findings in a sentencing order, which has not yet been issued. If a defendant disagrees with how a sentencing court weighed the evidence, the direct appeal of a sentencing order would be the first opportunity for a defendant to challenge the factual findings and credibility decisions within a trial court’s sentencing order. Here, Peterson’s argument centers on whether the trial court erred in discounting the evidence pertaining to Peterson’s drug addiction. Accordingly, we address this claim on the merits.
In turning to the merits of this claim, the following four requirements must be met in order to find the aggravating factor of CCP:
(1) the killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.
Lynch v. State, 841 So.2d 362, 371 (Fla.2003). Here, Peterson challenges only one prong: whether the murder was committed coldly. In particular, Peterson contends the trial court erred in not sufficiently weighing the fact that Peterson was highly addicted to cocaine and that this factor influenced his decision to kill Andrews. However, as the sentencing order makes clear, the trial judge was very concerned about whether Peterson’s self-reporting was credible, particularly because his self-reports were not supported by anything else in the record. Numerous family and friends testified during the penalty phase. While a few witnesses speculated that Peterson might be involved with drugs, it was not because they observed him using drugs.
In Turner v. State, 37 So.3d 212, 223 (Fla.), cert, denied, — U.S. -, 131 S.Ct. 426, 178 L.Ed.2d 332 (2010), this Court was faced with a similar issue. There, the defendant alleged that the trial court erred in finding the murder was committed coldly because the trial court also found that the defendant was under the influence of extreme mental or emotional disturbance and the defendant’s capacity to appreciate the criminality of his conduct was substantially impaired. Id. We rejected the argument, noting that the trial court did not find that the defendant was under the influence of cocaine at the time of the murder. Id. at 224. The Court further recognized that even if the trial court had found that the defendant was addicted to crack cocaine, this would not automatically preclude CCP from being found since “a chronic drug abuser can still act in accordance with a deliberate plan where the evidence indicates that the person ‘was fully cognizant of his actions on the night of the murder.’ ” Id. (quoting Guardado v. State, 965 So.2d 108, 117 (Fla.2007)).
Here, as the trial court detailed, the evidence showed that Peterson had carefully devised a plan to kill Andrews. He left his hotel, drove to pick up his *533 girlfriend’s truck, drove that vehicle to a cemetery where his ex-girlfriend was buried, and then pretended that vehicle broke down, all to create a ruse to bring his stepfather to the cemetery. Once there, he used brass knuckles to beat Andrews until he was unable to beat him any longer, and then he shot Andrews twice in the head. He disposed of his clothing, the weapons that he used, and the truck. Peterson then returned to his hotel, showered, picked up his girlfriend, and arrived at his mother’s house before the police arrived. Such a deliberate and complicated plan is contrary to Peterson’s allegation that the murder was not the product of cool and calm reflection. In fact, it is the antithesis to a murder committed during an emotional frenzy, panic, or a fit of rage. We deny this claim.

Whether the Murder Was Committed for Pecuniary Gain

Peterson contends that the trial court erred in finding the aggravating factor that the murder was committed for pecuniary gain. With respect to this aggravator, the trial court made the following findings:
The defendant had no steady employment, and had had no steady employment for over a decade at the time of the murder. For that time period he lived with his mother and the victim. They paid his child support of $350.00 per month, they paid for his truck, and gave him over $25,000.00 in cash during the year preceding the murder. Patricia Andrews also gave the defendant $10,000.00 in cash approximately one month before the murder, as prepayment for doing repairs to Laverne Run-dall’s home. Laverne Rundall testified that the defendant never ordered any materials or did any actual work on her home. Laverne Rundall and Becky Price both testified that Roy Andrews had told the defendant that this lifestyle was not going to go on, that he had to move out of the house, and that he and his wife (Andrews) were going to terminate the flow of money to the defendant. Penalty phase witnesses proved that the defendant spent large sums of money on hotel rooms, entertaining females, and cocaine during this period of his life. It has been proven beyond a reasonable doubt that this murder was motivated almost entirely by a desire to obtain money and financial gain.
Peterson asserts that in making this factual finding, the trial court relied solely on two pieces of inadmissible evidence: the testimony of Laverne Rundall (Peterson’s aunt) in which she mentioned that Andrews was angry at Peterson over the money that his mother gave him, and the testimony of Becky Price that Peterson admitted he was angry at Andrews because Andrews told Peterson’s mother not to give him more money and that he wanted to kill Andrews based on this. We disagree that this evidence was inadmissible and further hold that the record provides competent, substantial evidence that supports the trial court’s findings.
First, Peterson takes issue with the trial court relying on Rundall’s statement that Andrews was angry with Peterson over money. Specifically, during Rundall’s cross-examination, upon questioning by defense counsel, Rundall testified that when she told Patricia that Peterson had threatened Andrews, Patricia laughed about it and said that Andrews and Peterson “get along good. They hug each other. They love each other.” Defense counsel then asked:
[DEFENSE COUNSEL]: And had you ever seen anything between the two of them that indicated one was mad at the other?
[RUNDALL]: I’ve talked to Roy and I knew at times he was.
*534 [DEFENSE COUNSEL]: Roy was mad at Robbie?
[RUNDALL]: Yeah.
On redirect, the State then questioned Rundall as follows:
[PROSECUTOR]: Miss Rundall, what sorts of things was Roy angry at Robbie about?
[RUNDALL]: About—
[DEFENSE COUNSEL]: Objection, Your Honor. Hearsay.
THE COURT: Well, I don’t think it would if it’s not offered to prove the truth of the matter asserted, rather, being angry. So I’ll overrule the objection ....
[RUNDALL]: Over the money Pat was giving Robbie.
As an initial matter, the statement that Andrews was angry over Patricia giving Peterson money was not impermissible hearsay that could not be considered during the penalty phase. Hearsay is defined as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” § 90.801(l)(c), Fla. Stat. (2009). Here, Rundall’s statement did not necessarily assert that she learned that Andrews was angry at Peterson based only upon a conversation or statement. During testimony that defense counsel himself elicited, Run-dall asserted that she had talked to Andrews and also knew herself that at times, Andrews was mad at Peterson. She did not testify as to a particular conversation or statement that Peterson did not have the opportunity to rebut. She simply stated that she knew Andrews was angry on occasion over the money that her sister provided to Peterson. She also could have learned this information from observing them first-hand. Peterson has not demonstrated that this was impermissible hearsay.
Moreover, defense counsel opened the door to this statement by asking Rundall about whether Andrews was angry with Peterson. The State followed up during redirect, limiting its question only as to the matter of the disagreement between the two. “[T]he concept of ‘opening the door’ allows the admission of otherwise inadmissible testimony to ‘qualify, explain, or limit’ testimony or evidence previously admitted. The concept of ‘opening the door’ is ‘based on considerations of fairness and the truth-seeking function of a trial,’ ” Lawrence v. State, 846 So.2d 440, 452 (Fla.2003) (quoting Rodriguez v. State, 753 So.2d 29, 42 (Fla.2000)), and the consideration that without the fuller explication, the testimony that opened the door would be “incomplete and misleading.” Id.
Second, Peterson alleges that the trial court erred in considering a statement from Price in which Price was questioned as follows:
[PROSECUTOR]: Did you have any conversations with the defendant during the month of July, specifically as they related to Roy Andrews?
[PRICE]: Yes, sir, I did.
[PROSECUTOR]: Please tell the ladies and gentlemen of the jury about the first one, when it was and how it happened.
[PRICE]: It was around the first of July. He called me on the phone. He was very upset. My uncle had thrown him out of the house and had told my aunt not to give him any more money.
[PROSECUTOR]: This is him telling you this?
[PRICE]: Yes, sir.
[[Image here]]
[PROSECUTOR]: Did you have another conversation in the month of July *535 with the defendant regarding the same or similar topic?
[PRICE]: Yes, sir, I did, about two weeks later.
[PROSECUTOR]: Okay. Tell us the circumstances of that, please.
[PRICE]: He showed up at my house. He was very upset because his mother wouldn’t give him any money again because my uncle had told her not to. And—
[PROSECUTOR]: This is him telling you this again?
[PRICE]: Yes, sir.
As the State recognizes, generally a person’s own statement may be introduced against him or her. See § 90.803(18)(a), Fla. Stat. (2009) (providing a hearsay exception for “[a] statement that is offered against a party and is ... [t]he party’s own statement in either an individual or a representative capacity”). This statement clearly could be considered by the court. Thus, there is no error.
Additional evidence also supported the trial court’s findings on this claim. During the penalty phase, Rundall testified again, asserting that Andrews was responsible for “bankrolling” Peterson’s entire lifestyle. Peterson obtained money primarily from only Andrews and his mother, and he obtained his truck through Andrews. Rundall agreed that this situation was creating issues between Andrews and Peterson. Peterson wanted things to continue as they had in the past, while Andrews did not. Peterson’s mother also testified at the penalty phase and agreed that she and Andrews had talked about changing the situation to one in which neither of them would give Peterson money without the other knowing about it.
We deny this claim.

Whether the Court Erred in Giving Little Weight to the Evidence Pertaining to Peterson’s Cocaine Addiction

In this claim, Peterson alleges that the trial court erred in giving little weight to the mitigation pertaining to Peterson’s cocaine addiction. The record shows that in the penalty phase, Peterson called numerous witnesses, most of whom testified that Peterson was a good person who worked hard. A few friends and his aunt testified that they wondered on occasion if Peterson was involved with drugs because he lost a lot weight after his divorce or because he had a number of visitors who made it appear he was involved in drugs. However, nobody saw him use illegal drugs.
During the Spencer hearing, Peterson called Dr. William Morton, who was an expert in the field of psyehopharmacology relating to addictions. Dr. Morton testified that Peterson used a large amount of cocaine — up to a quarter of an ounce a week or 3.24 grams a day. According to Dr. Morton, Peterson was using so much cocaine at the time of the murder that Peterson’s “perceptions of Roy Andrews, of his mom, Ms. Andrews, of other people would not be accurate, would be contaminated with paranoia, contaminated with delusional thinking.” As a result of his cocaine addiction, Peterson was paranoid, impulsive, irritable, and aggressive, had delusional thinking, auditory hallucinations, and panic attacks, felt agitated or restless, and constantly craved cocaine. When he stopped using the drug he had a significant “crash” in which he would go into a rage and act like a wild man. Dr. Morton concluded that Peterson’s cocaine addiction “played a significant role” in Andrews’ death. Most of the testimony was based on Peterson’s self-reporting. The trial court questioned the reliability of Dr. Morton, but still gave slight weight to Peterson’s drug abuse.
*536 The trial court made the following findings:
While an expert witness, Dr. William Morton, Jr., testified that the defendant had a genetic predisposition of being at risk of being drug dependent, none of the defendant’s witnesses except for Clara Keene, his girlfriend of three weeks, testified that they had ever actually seen him use cocaine. Several of them claim that they suspected he did so, but none testified to seeing it. No witness ever testified that they felt moved to attempt to get the defendant to seek treatment for drug abuse. The defendant at no time made a meaningful effort to seek drug treatment on his own. He attended a single counseling session and never returned. Dr. Morton further testified that the defendant did not only use cocaine, he frequently sold it to other people.
Further, all of the testimony about the defendant’s drug abuse is based upon self-reporting. The defendant’s self-reports to Dr. Morton, friends, and family, otherwise unsupported by the record herein, greatly diminished the weight which this Court can give to the testimony of Dr. Morton. See Nelson v. State, 850 So.2d 514 (Fla.2003). Additionally, the record herein, showing the manner in which the defendant planned, prepared, and executed this complex scheme to kill and evade responsibility for the killing, make it glaringly evident that the defendant was clear headed and rational during the period leading up to the murder. There is no evidence in the record that the defendant’s substance abuse mitigated the heightened premeditation necessary to support the imposition of the death penalty. The Court assigns slight weight to the mitigator of drug abuse.
This Court has long held that “[t]he relative weight given each mitigating factor is within the discretion of the sentencing court.” Trease v. State, 768 So.2d 1050, 1055 (Fla.2000). Peterson recognizes this holding, but asserts that this Court’s opinion in Bell v. State, 841 So.2d 329 (Fla.2002), changed this rule of law. We disagree.
Bell is factually distinguishable because it addressed a situation where the sentencing court found that even though Bell was seventeen years old at the time of the crime, the statutory mitigating factor of age was entitled to “little weight” because the defendant did not show that in addition, he was also abused or neglected — an additional requirement that was not within the statute and was contrary to this Court’s holding in Urbin v. State, 714 So.2d 411, 418 (Fla.1998). Moreover, even after Bell, this Court has consistently recognized that determining the weight assigned to mitigating circumstances is a decision within the trial court’s discretion and subject to the abuse of discretion standard. See, e.g., Merck v. State, 975 So.2d 1054, 1065 (Fla.2007) (“This Court reviews a trial court’s assignment of weight to proven mitigating factors under an abuse-of-discretion standard.... We defer to the trial court’s determination ‘unless no reasonable person would have assigned the weight the trial court did.’ ” (quoting Rodgers v. State, 948 So.2d 655, 669 (Fla.2006))).
In reviewing the merits of this claim, we hold that the trial court did not abuse its discretion in finding that this mitigation was entitled to only slight weight. Dr. Morton’s testimony during the Spencer hearing was in stark contrast to the testimony presented to the jury. While Dr. Morton testified that Peterson’s drug abuse was very serious, none of Peterson’s family or friends ever saw him use drugs at any time. Evidence of drug use certainly can be mitigating, but in this case, the trial court’s reasoned order pro *537 vides ample basis for the weight given. Accordingly, we deny this claim.

Whether the Death Sentence is Disproportionate

In his penultimate claim, Peterson asserts that the sentence of death is disproportionate. The Eighth Amendment to the United States Constitution requires that this Court review the proportionality of each death penalty case to ensure that this punishment is “reserved only for those cases that are the most aggravated and least mitigated.” Crook v. State, 908 So.2d 350, 357 (Fla.2005); see also Williams v. State, 37 So.3d 187, 205 (Fla.2010). In determining whether death is a proportionate penalty in a given case, this Court has explained the standard of review as follows:
“[W]e make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” We consider the totality of the circumstances of the case and compare the case to other capital cases. This entails “a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.” In other words, proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.”
Williams, 37 So.3d at 205 (quoting Offord v. State, 959 So.2d 187, 191 (Fla.2007)).
Here, the trial court found three significant aggravators: (1) CCP; (2) HAC; and (3) pecuniary gain. The trial court considered numerous nonstatutory mitigators, weighing them as follow: (1) Peterson’s history of drug abuse (slight weight); and (2) Peterson’s positive qualities, including that (a) he was skilled as a mechanic (minimal weight); (b) sentencing Peterson to death would have a serious negative impact on others (no weight); (c) Peterson was a good friend (very slight weight); (d) Peterson contributed to his community (slight weight); (e) he has been an exceptional inmate (very slight weight); and (f) Peterson exhibited good and mannerly behavior throughout the court proceedings (no weight). The court found two proposed positive qualities were not proven: he was a good son and was amenable to rehabilitation. The trial court sentenced Peterson to death, concluding that “[t]he three weighty aggravators, when weighed against the two non-statutory mit-igators, which were assigned only at best slight weight, support a death sentence.”
In comparing this case to other capital cases, the facts presented here are quite similar to Bruno v. State, 574 So.2d 76 (Fla.1991). In that case, the defendant borrowed a gun from a friend a few days before the murder and borrowed a friend’s car on the day of the murder. Id. at 78. Then he and his son went to the victim’s house. Id. at 79. According to the defendant’s son, when the victim was playing with the stereo, the defendant pulled a crowbar from his pants and beat the victim, but the victim did not die. Id. at 78. The defendant then shot the victim twice in the head, and after the victim died, the defendant took the stereo equipment. Id. The Court found the same three aggrava-tors applied: (1) committed for pecuniary gain (which merged with the robbery ag-gravator); (2) HAC; and (3) CCP. Id. at 81-82. The main focus of the defense was a longtime use of drugs, evidence that was discounted by the trial court. Id. at 82-83. We held that the sentence of death was proportionate, based on the three statutory aggravating circumstances and no statutory mitigating circumstances. Id. at 83; see also Hauser v. State, 701 So.2d 329, 330 nn. 2-5, 332 (Fla.1997) (holding that death was proportionate in a case where *538 the victim was strangled and the trial court found the aggravators of CCP, HAC, and pecuniary gain, balanced against one statutory mitigator and four nonstatutory mitigators). As the sentence of death is proportional to the sentences imposed in similar cases, Peterson is not entitled to relief on this claim.

Whether the Court Should Reconsider Bottoson v. Moore and King v. Moore

Finally, Peterson asserts that Florida’s death penalty scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because Ring requires a jury determination of facts relied upon to increase maximum sentences in the capital sentencing context and Florida’s death penalty statute does not provide for such jury determinations. Specifically, he asks that this Court reconsider its decisions in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002). We have consistently rejected claims that Florida’s death penalty statute is unconstitutional. See, e.g., Baker v. State, 71 So.3d 802, 823-24 (Fla.2011), cert. denied — U.S. -, 132 S.Ct. 1639, 182 L.Ed.2d 238 (2012); Darling v. State, 966 So.2d 366, 387 (Fla.2007); Frances v. State, 970 So.2d 806, 822 (Fla.2007). Peterson has not presented any argument that requires us to reconsider this precedent. Thus, we deny relief.
CONCLUSION
Based on the foregoing, we affirm Peterson’s convictions for first-degree murder and tampering with evidence and his sentence of death.
It is so ordered.
LEWIS, QUINCE, and POLSTON, JJ„ concur.
CANADY, C.J., concurs in result.
PARIENTE, J., concurs as to conviction and dissents as to sentence with an opinion, in which LABARGA and PERRY, JJ., concur.

. Peterson’s girlfriend, Keene, had a truck that matched this description. On the night before the murder, she had given Peterson the keys to the truck and left it at the work place of Peterson’s brother, since she and Peterson went to the hotel together in his vehicle. She never saw her truck after that evening.

. The police were unable to obtain any usable fingerprints from the truck.

. Spencer v. State, 615 So.2d 688, 691 (Fla.1993).

. Specifically, the court found the following positive qualities: (a) he was skilled as a mechanic; (b) sentencing Peterson to death would have a serious negative impact on others; (c) Peterson was a good friend; (d) Peterson contributed to his community; (e) he has been an exceptional inmate; and (f) he exhibited good and mannerly behavior throughout the court proceedings. The court determined that two proposed positive qualities were not proven: he was a good son and was amenable to rehabilitation.

. To the extent that he claims that he suffered prejudice during the penalty phase, we likewise deny relief.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Since Jackson was in police custody when he agreed to question Peterson and was working directly with the police, the State does not contest that he was acting as an agent of the State at the time Peterson confessed. See generally United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).