# Supreme Court of Florida

_____

No. SC16-289
_____

**ROBERT EARL PETERSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC16-1279
_____

**ROBERT EARL PETERSON,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[July 6, 2017]

PER CURIAM.

Robert Earl Peterson appeals an order of the circuit court denying his motion

to vacate his conviction of first-degree murder and sentence of death filed under

Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of

habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained below, we affirm the postconviction court's order denying post-conviction relief as to the guilt phase and also deny Peterson's separate habeas petition. However, because Peterson's jury recommended death by a vote of seven to five and his sentence became final in 2012, see Peterson v. State, 94 So. 3d 514, 523 (Fla.), cert. denied, 133 S. Ct. 793 (2012), Peterson is entitled to a new penalty phase under Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016), cert. denied, No. 16-998 (U.S. May 22, 2017). See Mosley v. State, 209 So. 3d 1248, 1283 (Fla. 2016).

## FACTS AND PROCEDURAL BACKGROUND

Peterson was convicted of first-degree murder and evidence tampering, and was sentenced to death for the first-degree murder of his 64-year-old stepfather, Roy Andrews, after Peterson's jury recommended death by a vote of seven to five. Peterson, 94 So. 3d at 519, 523. The facts of Peterson's crime are set forth in this Court's opinion affirming his conviction and sentences on direct appeal:

> Peterson, who was 41 at the time of the crime, had been living at home with his mother and his stepfather. Andrews had been Peterson's stepfather since Peterson was fifteen. Shortly before the murder, Peterson's mother, at the urging of Andrews, told Peterson he had to move out. Also at Andrews' insistence, Peterson's mother stopped providing Peterson with money. Andrews was beaten and shot twice in Jacksonville, Florida, with his body left in the Greenlawn Cemetery very close to where Peterson's ex-girlfriend was buried.

<u>Guilt Phase Evidence</u>

The State first presented evidence to establish that about a month before the murder, Peterson told several people that he was going to kill Andrews. In early July 2005, Peterson talked to Becky Price, his second cousin, and told her that Andrews had "kicked him out" and told his mother not to give him more money. Peterson informed Price that he was going to kill Andrews. About two weeks later, after his mother refused to give him money again based on Andrews' direction, Peterson told Price a second time that he was going to kill Andrews. While the statements scared her, Price did not take him seriously and did not warn anyone. At the beginning of July, Peterson told his aunt that Andrews called his mother fat and that this made him "want to jump across the table and beat him to death."

On August 7, 2005, Peterson was staying at a hotel, the Masters Inn, with his girlfriend, Clara Keene. At 6:01 a.m. on August 8, the security cameras at his hotel showed Peterson leaving his room wearing jeans, shoes, a jacket, and a dark hat with a design on it.

At the time of the murder, Andrews was a counselor at a local drug clinic, Jacksonville Metro Treatment Center, and generally worked from 5:00 a.m. until 2:00 p.m. On August 8, 2005, Andrews arrived at 4:45 a.m. but left early at 9:30 a.m. Between 9 and 10 that morning, two people who worked close to Greenlawn Cemetery heard two loud pops that sounded like gun fire and then saw an older green pick-up truck with faded paint and big tires [N.1] leaving the cemetery very quickly.

> [N.1] Peterson's girlfriend, Keene, had a truck that matched this description. On the night before the murder, she had given Peterson the keys to the truck and left it at the work place of Peterson's brother, since she and Peterson went to the hotel together in his vehicle. She never saw her truck after that evening.

Andrews' body was found shortly after his murder. He was lying on the ground in a pool of blood, relatively close to the grave of Peterson's ex-girlfriend who had died about a year earlier. Near the body, law enforcement found a dark "Bike Week" baseball cap, which matched the hat that Peterson wore when he left the hotel room that morning. Andrews' truck was nearby, with the keys in the truck, the

passenger door opened, and the hood of the truck released but not fully opened. Andrews' wallet was still in his pocket, and he had a considerable amount of money in his pocket. Andrews had been beaten around the head and shot in the head twice.

Around 10:30 a.m. that same day, Peterson called Keene at the hotel and asked her to let him into their room because he forgot his key. The video surveillance cameras showed Keene opening the door for Peterson. In the video, Peterson was dressed in different clothes from those he had worn when he left the hotel a few hours earlier: he was wearing a different shirt and not wearing an undershirt, shoes, or his hat. According to Keene, Peterson was upset and told her they needed to go to his mother's house.

A few days after the murder, the police arrested one of Peterson's acquaintances, Jimmie Jackson, for driving on a suspended license. While Jackson was in custody, he agreed to call Peterson to ask about the murder. During their initial conversations, Peterson made a number of incriminating statements, implying that he had killed Andrews as he had planned. Jackson set up a meeting with Peterson, agreeing to meet him in a parking lot. Peterson drove up in his vehicle at the designated time and then entered Jackson's truck, which the police had wired.

During their conversation, Peterson admitted to killing Andrews and provided numerous details about the crime, including that he killed Andrews in broad daylight at 9:45 in the morning. Peterson explained that he killed Andrews because Andrews crossed the line by slapping his mother and calling her names. He then told Jackson that his mother knew about it because he and his mother were close and his mother was "contracting it." Peterson informed Jackson that even though the police took his red truck, he was not in that vehicle during the crime. He bragged that the vehicle he did use was "crushed and gone" on the same day as the crime. He then described the murder in detail, explaining that he was walking down Emerson Road, as though his truck had broken down, and Andrews picked him up and took him to the cemetery. Peterson described the crime as follows:

PETERSON: No, I busted his ass with brass knuckles. I tried to beat him to death so's I could take him somewhere else.
[JACKSON]: Oh, oh, oh, oh.

- 4 -

PETERSON: The bitch wouldn't fucking—I done broke his jaw, knocked all his teeth out, his eye ball hanging out his fucking head, the bitch wouldn't go out, so I had to go pop pop and haul ass. By that time, I'm covered from head to toe—

[JACKSON]: Blood.

PETERSON: So I hauled ass out way out to the west—

[JACKSON]: Yeah.

PETERSON: Hauled ass out to the fucking—got brain matter, the whole fucking nine yards. I went out to fucking Baldwin, stripped down, took a shower, scrubbed myself with a brush, got dressed, come back, still hit the cameras . . . .

. . . .

PETERSON: Set all my clothes, all my clothes, the vehicle I was driving, and the gun, you'll never find it. I don't give a fuck who you are. You can be Inspector [Clouseau], you ain't finding this shit. Drove back, and the man that I was working for says I was there from 9:00 to 11:00 and from 11:00 to 12:00. I eat lunch and from 12:00 to 1:00. I was sitting at my mama's house when they came and informed us he got killed.

Peterson next discussed his former girlfriend, who was buried in Greenlawn Cemetery, telling Jackson that Andrews "landed on her grave." Peterson also admitted that he made mistakes regarding some aspects of the plan because during the crime, there was a struggle and Peterson lost his hat and left some fingerprints in the truck. [N.2] He planned to explain this evidence by saying that he left his fingerprints when he was with Andrews the night before and Andrews had a nose bleed.

[N.2] The police were unable to obtain any usable fingerprints from the truck.

Dr. Jesse Giles, the medical examiner, testified that Andrews had a significant number of blunt force injuries spread over his head and neck that were consistent with brass knuckles and that occurred shortly before the time of death. Andrews' cause of death was two

contact gunshot wounds, where the gun was pressed against the victim's head. One gunshot wound was at Andrews' left temple. The other wound entered over Andrews' right ear, and the bone fragments from this wound severed the brain stem, which was fatal.

After the State rested, Peterson testified in his defense, denying that he killed Andrews. Peterson testified that he had visited Bike Week one time, and while there, he bought about four Bike Week hats. According to Peterson, on the day before the murder, he went to his mother's house to buy lottery tickets for her and saw Andrews sitting in his truck. Andrews had a trickle of blood coming from his nose, so Peterson helped wipe it away. He then left and bought the tickets as he planned to do. When he brought the tickets back to his mother's house, he noticed the interior light of the truck was on, so he reached into Andrews' truck and turned off the light, knocking off his hat. He did not reach down to retrieve his hat because he was in a hurry to return to his hotel room with his girlfriend.

Peterson further testified that on the day that Andrews was killed, he got up at 5:30 that morning and wore a jacket because it was very cold in the hotel room. He spent the morning on various errands and went to his mother's house. Around 9 a.m., Peterson began to work on a siding project near his mother's house. Shortly after he began, he realized that his phone was missing, so he left to find it. Peterson explained that the reason he was dressed differently when he arrived at his hotel room late that morning was because he had taken off his hat and left it at his mother's house, along with his warmer clothes. He also was not wearing shoes because his shoes got dirty when he walked through a yard during the siding project.

In explaining the incriminating statements that he made to Jackson, Peterson testified that near the time of the murder, he had a drug deal going on with Jackson, where he had "invested" $10,000 so that Jackson could sell the drugs and he could make a $4,000 profit. In an attempt to get his money back, he made up a story that he beat his stepfather so badly that he knocked out his eyeball and all of his teeth—something that was not even accurate as to Andrews' actual injuries.

In his defense, Peterson also called Joel Sockwell, who testified that he lived near Peterson's mother's house. On the day of the murder, Sockwell went to work, but left around 9 a.m. and saw Peterson in the neighborhood while he was out on the patio. However, Sockwell was not certain about the times.

The jury found Peterson guilty of first-degree murder and tampering with evidence.

Id. at 519-22.

During the penalty phase, the State presented four victim impact statements and relied upon the evidence already presented to establish the aggravating factors. Id. at 522. This Court summarized the evidence presented by Peterson during the penalty phase as follows:

> The defense presented numerous witnesses, most of whom lost contact with Peterson in recent years but testified that years ago, Peterson was a good worker and friend. Many of the witnesses who testified on Peterson's behalf knew of Peterson's involvement at the raceway where Peterson raced cars. For example, David Bradshaw testified that he had known Peterson since 1986, when they raced together. According to Bradshaw, during that time, Andrews and Peterson got along well and worked on cars together. However, Bradshaw did not have regular contact with Peterson during the last five years. During this period of time, Peterson was married, but he and his wife eventually divorced. A few witnesses testified that they speculated that Peterson might have become addicted to drugs after the divorce, but never actually witnessed Peterson use any illegal substances.
>
> In addition, Peterson presented testimony to establish that he had not received any disciplinary reports since he was in jail. Peterson also called his aunt, Laverne Rundall, who testified that she likewise had once contemplated whether Peterson was under the influence of drugs when she saw Peterson outside of Andrews' office at the Jacksonville Metro Treatment Center and did not recognize him because he was so scruffy and skinny. She asserted that Andrews and Peterson had a good relationship until recently, when they argued about money. On cross-examination, she asserted that Peterson obtained his truck and most of his money through his mother and Andrews.
>
> Peterson's mother, Patricia Andrews, also testified on his behalf, asserting that Peterson and Andrews were very close and

previously were involved in racing together. At the time of the murder, Andrews had been Peterson's stepfather for about eighteen years. According to Patricia, Peterson supported her significantly since she has chronic obstructive pulmonary disease and also provided a tremendous amount of support to Andrews when he was undergoing cancer treatment. They paid him for his help, including paying his child support and his truck insurance in exchange for his assistance. Andrews invited Peterson to live with them and told Peterson that if he was not working, they would find things for him to do around the house. On cross-examination, she admitted that Andrews recently had changed the arrangement, so that Peterson could not obtain money from one person without telling the other person. They tried to talk to Peterson about obtaining a better job.

Id. at 522-23.

The jury recommended the death penalty by a vote of seven to five for the murder of Andrews. Id. at 523. Following the jury's recommendation, the trial court found three aggravating factors: (1) the murder was cold, calculated, and premeditated (CCP); (2) the murder was heinous, atrocious, or cruel (HAC); and (3) the murder was committed for pecuniary gain. Id. Peterson did not offer any statutory mitigation, and none was found. The court found two nonstatutory mitigating circumstances: (1) Peterson had a history of drug abuse, and (2) Peterson had numerous positive qualities. Id. The trial court "sentenced Peterson to death, concluding that '[t]he three weighty aggravators, when weighed against the two non-statutory mitigators, which were assigned only at best slight weight, support a death sentence.' " Id.

On direct appeal, Peterson raised eight claims: (1) the trial court erred in admitting a statement that could imply Peterson committed a prior murder; (2) the trial court erred in permitting the State to present certain victim impact evidence; (3) the trial court erred in denying the motion to suppress the statements that Peterson made to Jackson; (4) the trial court erred in finding the CCP aggravating factor; (5) the trial court erred in finding that the murder was committed for pecuniary gain; (6) the trial court erred in giving little weight to the evidence pertaining to Peterson's cocaine addiction; (7) the death sentence is disproportionate; and (8) this Court should reconsider whether Florida's death penalty scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002). Peterson, 94 So. 3d at 523. We unanimously affirmed Peterson's convictions, id. at 538, and Peterson's sentence became final in 2012.[1] Id. at 514.

On November 13, 2013, Peterson filed an initial motion for postconviction relief, pursuant to Florida Rule of Criminal Procedure 3.851. Peterson's motion for postconviction relief raised the following ten claims: (1) Peterson's due process rights were violated when counsel lost or destroyed records; (2) ineffective assistance of counsel; (3) Peterson was denied his constitutional rights and the

_____

1. Justice Pariente, joined by Chief Justice Labarga and Justice Perry, dissented as to the sentence because none of the aggravators were unanimously found by the jury, relying on Ring, 536 U.S. 584. Peterson, 94 So. 3d at 538 (Pariente, J., concurring as to conviction and dissenting as to sentence).

effective assistance of counsel under the rules prohibiting Peterson's lawyers from interviewing jurors; (4) the State improperly withheld material evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); (5) Peterson was denied his right to effective mental health assistance of a mental health expert as required by <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985); (6) Florida's capital sentencing scheme is unconstitutional because it allows trial court judges unfettered discretion to assign weights to mitigating and aggravating factors without providing a baseline for their discretion; (7) Duval County prosecutor's discretionary use of the death penalty is arbitrary and thus violates the Eighth Amendment as announced in <u>Furman v. Georgia</u>, 408 U.S. 238 (1972); (8) Florida's use of the death penalty violates the Eighth Amendment's evolving standards of decency because juries are not required to issue a unanimous death sentence and Florida still adheres to a widely criticized practice of allowing a judge to override a jury's life verdict; (9) the cumulative prejudice resultant from numerous instances of counsel's deficient performance resulted in an unfair trial; and (10) Peterson is innocent of first-degree murder.

After a four-part evidentiary hearing on claims 1, 2, and 4, the postconviction court denied Peterson's motion. Peterson appeals the denial of his motion, contending the postconviction court erred by: (1) denying Peterson's motion to recuse or disqualify the postconviction judge; (2) denying Peterson's

motion to exclude the testimony of the State's expert, Dr. Alan J. Waldman; (3)

denying Peterson's claim that his due process rights were violated when trial

counsel lost or destroyed Peterson's trial records; (4) determining that trial counsel

was not ineffective in the guilt and penalty phases in failing to establish an

attorney-client relationship and in failing to investigate and present experts and lay

witnesses to demonstrate substantial mitigation; and (5) denying Peterson's motion

to appoint Dr. Morton, violating Peterson's due process rights.  Peterson also

argues that Hurst v. Florida (Hurst v. Florida), 136 S. Ct. 616 (2016), applies to his

case.  Additionally, Peterson raises a claim, without briefing, that the

postconviction court's order was erroneous for thirteen other reasons, which we

summarily deny.[2]  Peterson has also filed a separate petition for habeas corpus.

We affirm the denial of relief as to Peterson's ineffective assistance of guilt

phase counsel claim, but because we conclude that Peterson is entitled to a new

penalty phase proceeding under Hurst, we decline to address his other penalty

---

2. We once again repeat that this Court deems waived arguments made without briefing.  See Barwick v. State, 88 So. 3d 85, 101 (Fla. 2011).  As this Court has explained, "to merely refer to arguments presented during the postconviction proceedings without further elucidation is not sufficient . . . and these claims are deemed to have been waived."  Doorbal v. State, 983 So. 2d 464, 482 (Fla. 2008) (citation omitted).  This Court has further explained that "[t]he purpose of a legal brief is to offer argument in support of the issues raised on appeal."  Bradley v. State, 33 So. 3d 664, 685 (Fla. 2010).

phase claims.[3]  Additionally, as we discuss first, we affirm the denial of Peterson's

motion to recuse or disqualify the postconviction judge.

**ANALYSIS**

**Motion to Recuse or Disqualify Trial Judge in Postconviction Proceedings**

At the outset, Peterson contends that the postconviction court erred in

denying his motion to disqualify the trial judge during the postconviction

proceedings.[4]  "A motion to disqualify is governed substantively by section 38.10,

Florida Statutes [(2014)], and procedurally by Florida Rule of Judicial

Administration 2.330." Gore v. State, 964 So. 2d 1257, 1268 (Fla. 2007).  The

statute requires that the moving party file an affidavit in good faith "stating fear

that he or she will not receive a fair trial . . . on account of the prejudice of the

judge" as well as "the facts and the reasons for the belief that any such bias or

prejudice exists." § 38.10, Fla. Stat. (2014).  "The judge against whom an initial

---

3. Specifically, because we conclude Peterson is entitled to a new penalty phase, we do not address his claims that the postconviction court erred in not excluding the testimony of the State's expert, neuropsychiatrist Dr. Alan J. Waldman, or erred in denying Peterson's motion to appoint Dr. William A. Morton, a psychopharmacolgist, as both experts either testified or would have testified as to the ineffectiveness of penalty phase counsel.

4. On April 23, 2014, Peterson filed a petition for writ of prohibition seeking to disqualify the trial judge on the same basis he raises on appeal.  On May 22, 2014, this Court unanimously denied the petition without prejudice to raise the issue on appeal.  Peterson v. State, 145 So. 3d 827 (Fla. 2014) (table).

motion to disqualify . . . is directed shall determine only the legal sufficiency of the motion and shall not pass on the truth of the facts alleged." Fla. R. Jud. Admin. 2.330(f). A trial judge's ruling on a motion to disqualify "may be assigned as error and may be reviewed as are other rulings of the trial court." § 38.10, Fla. Stat. (2014).

Peterson's motion alleged that the trial judge improperly made comments regarding the efficacy of mitigation coordinators in other cases, including a case where the mitigation coordinator—Sarah Flynn—was the same mitigation coordinator appointed to Peterson's case during postconviction proceedings. These comments, Peterson contends, displayed a bias against mitigation coordinators that created a belief that he would not receive a fair postconviction hearing because the postconviction court would "not neutrally consider mitigation that is offered through a mitigation coordinator." Peterson's motion does not allege that the trial judge made any statements in this case regarding mitigation coordinators, and in fact, the trial judge appointed a mitigation coordinator in Peterson's postconviction proceedings below.

We conclude that not only was the motion to disqualify or recuse legally insufficient, but the order denying the motion did not impermissibly exceed the scope of the inquiry by passing on the truth of the facts alleged. As this Court explained in Bundy v. Rudd, 366 So. 2d 440 (Fla. 1978), "[w]hen a judge has

- 13 -

looked beyond the mere legal sufficiency of a suggestion of prejudice and attempted to refute the charges of partiality, he has then exceeded the proper scope of his inquiry and on that basis alone established grounds for his disqualification." Id. at 442.

This Court has previously considered whether the denial of a motion to recuse or disqualify a trial judge has exceeded the proper scope of the inquiry by considering whether the order "passed on the truth of the facts alleged and adjudicated the question of his disqualification." Cave v. State, 660 So. 2d 705, 708 (Fla. 1995) (emphasis added). We conclude that the postconviction judge's denial of Peterson's motion to recuse or disqualify in this case did not "pass[] on the truth of the facts alleged and adjudicate[] the question of his disqualification." Id. Rather, the order denied Peterson's motion as legally insufficient because the facts alleged—that the postconviction court had made prior written statements in other cases regarding the use of mitigation specialists—would not "place a reasonably prudent person in fear of not receiving a fair and impartial trial." Livingston v. State, 441 So. 2d 1083, 1087 (Fla. 1983). In short, the order only stated the basis for the legal insufficiency of the motion and went no further.

Accordingly, we deny this claim.

**Lost or Destroyed Trial Records**

Peterson alleges that his due process rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were violated when trial counsel Fletcher "lost or destroyed" Peterson's trial records. This error, Peterson asserts, prohibited counsel from adequately investigating and pleading claims of ineffectiveness. Intertwined with this claim is Peterson's contention that a conflict of interest existed between him and trial counsel Fletcher due to Fletcher's burdensome caseload and what Peterson describes as a "severely strained attorney-client relationship between Peterson and Fletcher."

We "review for the circuit court's denial of this claim [for] abuse of discretion." Jones v. State, 928 So. 2d 1178, 1192 (Fla. 2006) (citing Parker v. State, 904 So. 2d 370, 379 (Fla. 2005)). However, "[t]he law is scarce on [the] issue" of whether the loss or destruction of trial counsel's trial records hindered appellate counsel's investigation and, therefore, violated the postconviction defendant's due process rights. Id. We explained in Jones that "the Eleventh Circuit has stated that '[w]hen a defendant asserts prejudice because of the loss of evidence, he must show that the loss impaired his ability to provide a meaningful defense.' " Id. at 1192-93 (quoting United States v. Solomon, 686 F.2d 863, 872 (11th Cir. 1982)). In denying Peterson's claim, the postconviction court found as follows:

Fletcher denied destroying any of Defendant's case files. Fletcher instead testified that, in response to the Defendant's complaints regarding Fletcher at sentencing and Defendant's request that someone else hold onto the files, Fletcher packed Defendant's records in ten or eleven boxes and delivered them to Nolan at the [Regional Collateral Counsel] office. Fletcher specifically recalled loading the boxes "into the back of [his] green [SUV]" and taking them over to Nolan's office. Fletcher also vehemently denied commenting on Defendant's guilt or intentionally providing ineffective assistance of counsel. The Court finds Fletcher's testimony worthy of belief. See Foster v. State, 929 So. 2d 524, 537 (Fla. 2006) ("[T]he trial court has 'the superior vantage point to see and hear the witnesses and judge their credibility.'"). Further, the Court must note that before Defendant's case was "closed out," [Regional Collateral Counsel] moved the location of its office and had to transport all of their files to the new location.

(Record citations omitted.)

We agree with the postconviction court that Peterson cannot demonstrate that the absence of these eleven trial box records, which Fletcher testified contained "supplemental" files that were mostly duplicative of records that could be reproduced, such as general police records, violated his due process rights. This Court previously considered whether the loss of "trial counsel's personal notes of any interviews he had with [his client], [the client's] relatives, or other witnesses, as well as phone messages and impressions and theories of the case" hindered "collateral counsel's investigation." Jones, 928 So. 2d at 1193. As this Court explained, "these personal notes and impressions most likely would support the State's position by identifying specific reasons for trial counsel's choice not to call certain witnesses or pursue various courses of action." Id. Unlike in Jones, the

files in this case contained "the State's discovery exhibits, copies of police reports, copies of depositions, DVD discs with interview, phone calls . . . probably four boxes full of case law," and "reproduction of the same things over and over and over."

Additionally, "[Peterson's] counsel does not identify what records were not available, or what particular argument he is prevented from making due to a lack of records." Asay v. State, 210 So. 3d 1, 29 (Fla. 2016), petition for cert. filed, No. 16-9033 (U.S. Apr. 29, 2017) (rejecting similar claim relating to lost trial records); see Griffin v. State, 866 So. 2d 1, 21 (Fla. 2003) (holding that defendant who "has not pointed to any errors that occurred during the portions of the proceedings that were not transcribed" is not entitled to habeas relief).

Peterson also does not point to any prejudice arising from the lost or destroyed trial records, presumably because he alleges, relying on United States v. Cronic, 466 U.S. 648 (1984), that an actual conflict of interest existed between him and trial counsel Fletcher. In Cronic, the United States Supreme Court held that the Sixth Amendment requires that the accused have "counsel acting in the role of an advocate" by requiring defense counsel to put the prosecution's case to meaningful adversarial testing. Id. at 656-59. Cronic, thus, "created an exception to the Strickland [v. Washington, 466 U.S. 668 (1984),] standard for ineffective assistance of counsel and acknowledged that certain circumstances are so

- 17 -

egregiously prejudicial that ineffective assistance of counsel will be presumed." Stano v. Dugger, 921 F.2d 1125, 1152 (11th Cir. 1991) (en banc).

We have explained that the Cronic standard is reserved for when "the assistance of counsel has been denied entirely or withheld during a critical stage of the proceeding such that the 'likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary.' " Chavez v. State, 12 So. 3d 199, 212 (Fla. 2009) (quoting Mickens v. Taylor, 535 U.S. 162, 166 (2002)). Peterson has provided little evidence as to how his relationship with Fletcher or Fletcher's burdensome caseload demonstrated the high standard of "per se ineffective assistance" of counsel. Id. at 212-13. Therefore, we reject Peterson's attempt to rely on the per se rule from Cronic to avoid establishing prejudice for his claim.

Accordingly, we deny this claim.

### Ineffective Assistance of Guilt Phase Counsel

Because Peterson is entitled to a new penalty phase under Hurst, we do not address whether Peterson's counsel was ineffective in the penalty phase of his trial. To determine whether Peterson is entitled to a new guilt phase, however, we address his claim that guilt phase counsel was deficient in failing to establish an attorney-client relationship and was operating under an actual conflict of interest.

Following the United States Supreme Court's decision in Strickland, this

Court has explained that for ineffective assistance of counsel claims to be

successful, two requirements must be satisfied:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Schoenwetter v. State, 46 So. 3d 535, 546 (Fla. 2010) (quoting Maxwell v.

Wainwright, 490 So. 2d 927, 932 (Fla. 1986) (citations omitted)).

To establish the deficiency prong under Strickland, the defendant must prove

that counsel's performance was unreasonable under "prevailing professional

norms." Morris v. State, 931 So. 2d 821, 828 (Fla. 2006) (quoting Strickland, 466

U.S. at 688). "A fair assessment of attorney performance requires that every effort

be made to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time." Strickland, 466 U.S. at 689.

As to the prejudice prong of Strickland, this Court has explained:

> With respect to those claims alleging ineffective assistance of counsel specifically during the penalty phase, penalty-phase prejudice under the Strickland standard is measured by "whether the error of trial counsel undermines this Court's confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court." Hurst [v. State, 18 So. 3d 975, 1013 (Fla. 2009)]. Under this standard, a

defendant is not required "to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' " Porter v. McCollum, 558 U.S. 30, 44 (2009) (quoting Strickland, 466 U.S. at 693-94).

Wheeler v. State, 124 So. 3d 865, 873 (Fla. 2013).

"[T]his Court's standard of review is two-pronged: (1) this Court must defer to the [trial] court's findings on factual issues so long as competent, substantial evidence supports them; but (2) must review de novo ultimate conclusions on the deficiency and prejudice prongs." Everett v. State, 54 So. 3d 464, 472 (Fla. 2010) (quoting Reed v. State, 875 So. 2d 415, 421-22 (Fla. 2004)). "Thus, under Strickland, both the performance and prejudice prongs are mixed questions of law and fact, with deference to be given only to the lower court's factual findings." Eaglin v. State, 176 So. 3d 900, 906 (Fla. 2015) (quoting Stephens v. State, 748 So. 2d 1028, 1033 (Fla. 1999)).

Peterson contends that his trial counsel was per se ineffective because of an actual conflict of interest and because of counsel's failure to establish an attorney-client relationship. Peterson, however, presents little argument for his claim that counsel was deficient in establishing an attorney-client relationship and operated under an actual conflict of interest that adversely affected his representation of Peterson. Peterson's entire argument on appeal as to this claim is that because counsel Fletcher represented six other capital defendants during the time he

represented Peterson, and in one of these cases, the assistant state attorney e-mailed Fletcher more than a year after Peterson was convicted to suggest that Fletcher withdraw in the case because of his busy schedule, Peterson was deprived of his Sixth Amendment right to counsel. Peterson also does not allege with any specificity how Fletcher failed to establish an attorney-client relationship with Peterson except to briefly reference that Fletcher only visited Peterson in jail intermittently. In short, Peterson has not raised before this Court a specific claim of deficiency, and instead relies on "speculative allegations of ineffectiveness." Miller v. State, 161 So. 3d 354, 368 (Fla. 2015). Moreover, we agree with the postconviction court's analysis of Peterson's subclaim that Peterson has failed to meet his burden in proving that Fletcher's workload constituted an actual conflict of interest that deprived Peterson of his constitutional right to counsel. In fact, as already discussed, it appears that Peterson is attempting to "rely on the per se rule from Cronic to avoid establishing prejudice" for his claim. Chavez, 12 So. 3d at 213.

Accordingly, we deny this claim.

**Hurst Relief**

Peterson contends that he is entitled to relief pursuant to the United States Supreme Court's opinion in Hurst v. Florida, which held that Florida's capital sentencing scheme is unconstitutional because "[t]he Sixth Amendment requires a

jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." 136 S. Ct. at 619. On remand, this Court held that a unanimous jury recommendation for death is required before the trial court may impose a sentence of death. Hurst, 202 So. 3d at 54. Moreover, this Court held that "in addition to unanimously finding the existence of any aggravating factor, the jury must also unanimously find that the aggravating factors are sufficient for the imposition of death and unanimously find that the aggravating factors outweigh the mitigation before a sentence of death may be considered by the judge." Id. We also determined that Hurst error is capable of harmless error review. Id. at 67.

Hurst applies retroactively to defendants whose sentences became final after the United States Supreme Court issued its decision in Ring. Mosley, 209 So. 3d at 1283. Thus, Hurst applies retroactively to this case, which became final in 2012.

Accordingly, we must determine whether the Hurst error during Peterson's penalty phase proceeding was harmless beyond a reasonable doubt. "[I]n the context of a Hurst v. Florida error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to [the] death sentence." Hurst, 202 So. 3d at 68. As applied to the right to a jury trial with regard to the facts necessary to impose the death penalty, it must be clear

beyond a reasonable doubt that a rational jury would have unanimously found that each aggravating factor was proven beyond a reasonable doubt, that the aggravating factors were sufficient to impose death, and that the aggravating factors outweighed the mitigating circumstances.

We conclude that the State cannot establish that the error in Peterson's case was harmless beyond a reasonable doubt. In Peterson's case, the jury did not make the requisite factual findings and did not unanimously recommend a sentence of death. Instead, the jury recommended the sentence of death by a vote of seven to five. Therefore, this Court has no way of knowing if the jury unanimously found any of the three aggravating factors—CCP, HAC, pecuniary gain—that the aggravating factors were sufficient to impose a death sentence, or whether the aggravating factors outweighed the mitigating circumstances. Further, this Court cannot speculate why the five jurors who voted to recommend a sentence of life imprisonment determined that a sentence of death was not the appropriate punishment. Thus, we conclude that the Hurst error in Peterson's case was not harmless beyond a reasonable doubt. In doing so, we note that the jury in Peterson's case recommended a sentence of death by the same narrow vote that Timothy Lee Hurst's jury recommended where the aggravating factors presented

required a factual determination.  See Hurst, 202 So. 3d at 47.  Accordingly, we

vacate Peterson's sentence of death and remand for a new penalty phase.[5]

## HABEAS PETITION

In addition to appealing the denial of his postconviction motion, Peterson

has filed a petition for habeas corpus relief.  The petition raises six issues,[6] the

majority of which allege ineffectiveness of trial counsel and are therefore not

properly addressed in a habeas petition.  See Thompson v. State, 759 So. 2d 650,

668 n.13 (Fla. 2000).  Additionally, Peterson's claim that the trial court violated his

due process rights by appointing trial counsel with a high caseload which

precluded counsel from providing effective representation merely uses "different

grounds to reargue" his postconviction claim that trial counsel operated under an

---

5. We reject Peterson's argument that section 775.082(2), Florida Statutes (2015), entitles him to be resentenced to life imprisonment.  See Hurst, 202 So. 3d at 44, 63-66.

6. Peterson's six habeas claims are as follows: (1) whether Peterson's direct appeal counsel was ineffective for failing to raise a Fourth Amendment claim; (2) whether Peterson's trial counsel was ineffective for failing to test and investigate DNA evidence; (3) whether Peterson's direct appeal counsel was ineffective in failing to ensure that the entire record was transcribed; (4) whether trial counsel was ineffective in failing to challenge the voluntariness of Peterson's confession; (5) whether the trial court violated Peterson's due process rights by appointing trial counsel with an unrealistically high caseload which prevented trial counsel from providing effective assistance; and (6) whether trial counsel was ineffective in failing to challenge the fact that the State's confidential informant acted outside of the scope of what is allowed.

- 24 -

actual conflict of interest, and is therefore "improper." <u>Breedlove v. Singletary</u>, 595 So. 2d 8, 10 (Fla. 1992). Accordingly, we address only his first and third habeas claims that pertain to the ineffectiveness of direct appeal counsel.

Peterson claims that his appellate counsel was deficient in failing to raise a Fourth Amendment violation claim stating that the search of Peterson's cell phone violated his Fourth Amendment guarantee against unreasonable search and seizure. However, Peterson devotes his argument to alleging ineffectiveness of <u>trial counsel</u> for not arguing that the search was illegal and moving to suppress the evidence. Therefore, it would appear that because trial counsel did not move to suppress the evidence gathered from Peterson's cell phone, the issue of whether the police search of Peterson's cell phone violated the Fourth Amendment was not preserved. Appellate counsel cannot be deemed ineffective for failing to present arguments that are unpreserved and procedurally barred. <u>See</u> <u>Nelson v. State</u>, 43 So. 3d 20, 35 (Fla. 2010). "The only exception to this is when the claim involves fundamental error," which Peterson has not alleged. <u>Id.</u> Accordingly, we deny Peterson's claim.

Peterson also contends that appellate counsel was ineffective in failing to ensure that the entire trial record was transcribed and became a part of the record on appeal. In <u>Ferguson v. Singletary</u>, 632 So. 2d 53, 58 (Fla. 1993), this Court rejected a similar claim that appellate counsel was ineffective for failing to have

transcribed portions of the record, including parts of voir dire, the charge conference, and a discussion of whether the defendant would testify. The Court reasoned that "[h]ad appellate counsel asserted error which went uncorrected because of the missing record, or had [the defendant] pointed to errors in this petition, this claim may have had merit." Id. However, because the defendant "point[ed] to no specific error which occurred" during the portions of the record that remained untranscribed, the Court concluded that appellate counsel was not ineffective. Id.; see also Turner v. Dugger, 614 So. 2d 1075, 1079-80 (Fla. 1992) (finding defendant had not been prejudiced by failure of counsel to have charge conference transcribed). More recently, in Thompson, 759 So. 2d 650, this Court considered a similar claim of ineffective assistance of appellate counsel when counsel did not provide this Court with an adequate record during the direct appeal "because some pretrial hearings and bench conferences were not transcribed and included in the appellate record." Id. at 660. In rejecting this claim, this Court explained, that "[a]s with the defendant in Ferguson, Thompson has not pointed to any errors that occurred during the untranscribed portions of the proceedings. Therefore, these habeas claims are without merit." Id.

Peterson has not "pointed to any errors that occurred during the untranscribed portions of the proceedings." Id. Accordingly, we deny this habeas claim.

# CONCLUSION

For the foregoing reasons, we affirm the denial of postconviction relief and deny Peterson's petition for habeas corpus relief. However, we vacate Peterson's sentence of death and remand for a new penalty phase proceeding under <u>Hurst</u>.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
LAWSON, J., concurs specially with an opinion.
CANADY, J., concurs in part and dissents in part with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

LAWSON, J., concurring specially.

See <u>Okafor v. State</u>, 42 Fla. L. Weekly S639, S641, 2017 WL 2481266, at *6 (Fla. June 8, 2017) (Lawson, J., concurring specially).

CANADY, J., concurring in part and dissenting in part.

I concur with the majority's decisions to affirm the denial of Peterson's motion to recuse or disqualify the trial judge, to affirm the denial of relief regarding the conviction, and to deny habeas relief. However, I dissent from the decision to vacate the death sentence because, as I have previously explained, <u>Hurst</u> should not be given retroactive effect. See <u>Mosley v. State</u>, 209 So. 3d 1248, 1285-91 (Fla. 2016) (Canady, J., concurring in part and dissenting in part). The

other penalty phase issues raised by Peterson are without merit. Accordingly, I would affirm Peterson's death sentence.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Duval County,
Lawrence Page Haddock, Judge - Case No. 162005CF011551AXXXMA
And an Original Proceeding – Habeas Corpus

Frank Tassone and Casey Woolsey of Tassone & Dreicer, LLC, Jacksonville, Florida,

for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, and Jennifer L. Keegan, Assistant Attorney General, Tallahassee, Florida,

for Appellee/Respondent