# Supreme Court of Florida

_____

No. SC19-140
_____

**ERIC KURT PATRICK,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

June 4, 2020

PER CURIAM.

Eric Kurt Patrick appeals an order denying a claim of ineffective assistance of counsel for failure to challenge a biased juror. Because the order concerns postconviction relief from a first-degree murder conviction for which a sentence of death was imposed, this Court has jurisdiction of the appeal under article V, section 3(b)(1), Florida Constitution. Based upon the postconviction court's finding that Patrick's trial counsel had a reasonable strategic basis for not challenging the juror, a finding supported by competent, substantial evidence, we affirm the order denying postconviction relief.

# BACKGROUND

Patrick was convicted of the kidnapping, robbery, and first-degree murder of Steven Schumacher. *Patrick v. State* (*Patrick I*), 104 So. 3d 1046, 1054 (Fla. 2012). He was sentenced to death for the murder, and this Court affirmed his convictions and sentences on direct appeal. *Id.* at 1055. Thereafter, Patrick filed his initial motion for postconviction relief under Florida Rule of Criminal Procedure 3.851, raising seven claims, all of which were denied. *Patrick v. State* (*Patrick II*), 246 So. 3d 253, 259 (Fla. 2018). Patrick appealed the denial of that motion and also filed a petition for writ of habeas corpus raising a claim under *Hurst v. Florida*, 136 S. Ct. 616 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *receded from in State v. Poole*, 45 Fla. L. Weekly S41 (Fla. Jan. 23, 2020), *clarified*, 45 Fla. L. Weekly S121 (Fla. Apr. 2, 2020). We granted Patrick's petition for writ of habeas corpus and directed the circuit court to hold a new penalty phase. *Patrick II*, 246 So. 3d at 257, 265. As for the appeal, we affirmed the denial of relief as to all but one claim. *Id.* at 259.[1] That claim, which alleged ineffective assistance of counsel for failure to challenge a biased juror, had been summarily denied. *Id.* at 259-60. We reversed that summary denial and remanded for an evidentiary hearing. *Id.* at 264.

---

1. We did not reach the merits of the claims related to the penalty phase, as they were moot due to the grant of *Hurst* relief. *Patrick II*, 246 So. 3d at 260.

The bias at issue, in the juror's own words, was against any person the juror "felt . . . was a homosexual." *Id.* at 263. This juror stated that he "personally believe[s]" that any such person "is morally depraved enough that he might lie, might steal, might kill." *Id.* He also said that he "would have a bias if [he] knew the perpetrator was homosexual" and confirmed that this bias might affect his deliberations. *Id.* This juror was never asked to, and did not, back away from this position. Based on the voir dire record, we concluded that the juror was actually biased against Patrick. *Id*. at 263-64.

The facts surrounding Patrick's crimes are set forth in detail in our two prior opinions in this case. *Patrick I*, 104 So. 3d at 1053-54; *Patrick II*, 246 So. 3d at 257-58. However, briefly stated, Patrick beat Schumacher to death after staying with Schumacher in Schumacher's home for one to two weeks. *Patrick I*, 104 So. 3d at 1053. In an interview with police, Patrick explained that he was homeless when he met Schumacher and that Schumacher had offered to help him.

In the same interview with police, Patrick said that Schumacher was kind and generous with him and that, in exchange, Patrick had shown him affection and allowed Schumacher to perform certain sex acts on him. In Patrick's opening statement at trial, his counsel told the jury that Patrick was not "a gay man" but "put up with what he believed to have been wrong" because he was "as down and out as a human being could be" and wanted the help Schumacher offered. In

Patrick's interview with the police, which was played for the jury at trial, Patrick tried to distance himself from being characterized as homosexual, through words and inflection. He referred to Schumacher as an "old gay guy." Patrick said that he was "kind of repulsed by" the sexual activity and exchanges of affection between Schumacher and himself but that he participated in them because Schumacher was "such a nice person" and Patrick did not think his requests were "to[o] much [for Schumacher] to ask for."

According to Patrick's statement to police, on the night he killed Schumacher, Schumacher attempted to engage in a sex act that Patrick had not previously allowed and did not agree to. Patrick said that when Schumacher persisted and "came onto [Patrick] a little bit too powerful," Patrick lost control of himself and began beating Schumacher. In this same interview with police, Patrick stated that, on prior occasions, he had met other men at bars and let them perform sex acts on him in exchange for help when he was struggling with homelessness. Patrick referred to the men he met at the bars as "these gay guys," in an apparent effort to distinguish them from himself. Counsel and the trial court were all aware of this information before trial, and it was ultimately presented to the jury, along with evidence that Patrick had taken Schumacher's truck, ATM card, watch, and some money from his wallet after severely beating Schumacher, tying him up, placing him in a bathtub, and leaving the apartment. *Id.* at 1064.

With regard to the murder charge, Patrick's counsel attempted to secure a verdict for the lesser-included offense of second-degree murder, or possibly manslaughter. Patrick's counsel argued, "Mr. Patrick was just a poor homeless pathetic drug addict who let all of his frustration of his whole life overload him and erupt at what Mr. Schumacher asked him to do" while under the influence of alcohol and cocaine. Patrick's counsel argued that Patrick had gone along with the prior sexual activity but that it "ate him up inside" because it was "against [his] instincts" and that a sense of guilt fueled the "explosive result" that occurred. Patrick's counsel acknowledged that the beating was "completely unjustified" but contended that it "happened for a reason," which was that Schumacher "pushed an issue that was for some reason a button that this man had," causing Patrick to go "over the edge." The details Patrick provided in his confession to the beating were part of the basis for his counsel's arguments in support of a second-degree murder conviction. Indeed, Patrick's counsel urged the jury to find Patrick honest and candid in that statement.

In reversing the summary denial of Patrick's claim that his counsel was ineffective for failing to challenge the juror at issue, we explained that, to survive the pleading stage of a claim of ineffective assistance of counsel, a defendant must sufficiently allege both prongs required by *Strickland v. Washington*, 466 U.S. 668 (1984)—deficient performance by counsel and prejudice—presenting facts that are

not conclusively refuted by the record. *Patrick II*, 246 So. 3d at 260. With respect to the specific requirements of a claim alleging ineffective assistance for failure to challenge a biased juror, we applied our holding in *Carratelli v. State*, 961 So. 2d 312, 323-24 (Fla. 2007), that a defendant establishes prejudice by showing that "one who was actually biased against the defendant sat as a juror." *Patrick II*, 246 So. 3d at 263. We further explained that "actual bias" means "bias-in-fact that would prevent service as an impartial juror." *Id.* (quoting *Carratelli*, 961 So. 2d at 323-24). We concluded that Patrick's motion met the prejudice prong because the juror's answers showed that he was "predisposed to believe that Patrick is morally depraved enough to have committed the charged offenses." *Id*. at 264. We acknowledged that the juror's bias would have extended to the victim as well but concluded that this additional bias did not negate the bias the juror would have felt concerning Patrick. *Id.* Accordingly, we held that Patrick's motion met the required prejudice standard under *Carratelli*. *Id.*

We further concluded that Patrick's motion was facially sufficient to suggest deficient performance in failing to challenge this juror. *Id.* At the same time, we recognized the possibility that Patrick's counsel's decision not to strike this juror was strategic. *Id.* Because of this possibility, we held that an evidentiary hearing was required on this claim. *Id.*

At the evidentiary hearing on remand, the court considered the testimony of two members of Patrick's trial team: George Reres and Dorothy Ferraro. Reres was Patrick's lead counsel and the attorney primarily responsible for the guilt phase. By the time of Patrick's trial, he had been a practicing attorney for approximately twenty-seven years. He had tried his first capital case about five years into his career and had consistently tried capital cases, along with other serious criminal cases, from that time forward. By the time of Patrick's trial, Reres had tried twenty-two or twenty-three first-degree murder cases and about thirty manslaughter cases.

After reviewing parts of the record and being questioned about them at the evidentiary hearing, Reres said that, although he did not have a significant independent recollection of the trial or recall of his thought process at the time, he had no reason to believe that the juror in question should have been stricken. In addition, Reres testified that he had never left a juror on the panel without a strategic basis for doing so unless he had no remaining peremptory strikes, in which case he would have asked for more.[2] Ferraro testified that no juror was

_____

2. Reres mistakenly thought he had no peremptory strikes left when the panel was finally determined. He refused to accept the jury due to the objections he had raised throughout jury selection, but he expressly stated on the trial record that he was not seeking additional peremptory strikes.

either stricken or kept on the panel without the approval of Patrick, who Reres said was intelligent and engaged in the process and "had strong opinions."

During the course of the hearing, Reres embraced two reasons that this juror was desirable from a defense perspective under the particular facts of this case, which he opined made a strong case for guilt.

First, while acknowledging that, when necessary, he would have chosen a juror who was more favorable for the penalty phase than for the guilt phase despite Patrick's personal emphasis on the guilt phase, Reres testified that the juror in question was "probably a good juror for the defense" in the guilt phase. Reres explained that one of the defense theories was that Schumacher preyed on Patrick. He opined that this juror's bias would have made him predisposed to accept that claim and "listen carefully to" the defense that Patrick beat Schumacher in reaction to Schumacher's sexual advance and therefore committed something less than first-degree murder.

Second, when Reres was reminded of statements this juror made concerning the death penalty, he said that he had become "enamored" of this juror from a penalty-phase perspective. Specifically, although this juror had said early in the process that he was "open minded" and "in the middle" concerning the death penalty, when later asked if the death penalty was worse than a life sentence, he answered as follows:

Honestly I don't think any of us in here want to bear that burden when we leave here whether he's found innocent or guilty of thinking wow, I just sent somebody off to be executed, oh my God, I hope we all make the right decision. Or, life in prison, he has his whole life to think about what he did and climb the walls and torment—I don't know, I would be tormenting myself trying to put myself in his shoes, in the meantime thinking what he may be thinking.

Further, this juror said that he would like to ask the defendant which penalty he preferred. Although Reres did not mention this point, we note that the juror made these comments after his earlier statements about how he would view the "perpetrator" if he "knew the perpetrator was homosexual." Reres opined that this juror was reexamining his feelings concerning the death penalty during the course of voir dire, which suggested that he might lead other jurors down the same path. Reres concluded unequivocally that this juror was good for the defense for the penalty phase.

Notes Reres had made during voir dire are consistent with his theories of why this juror would not have been struck by the defense. These notes include the struck-through words "[Defendant] wants out," followed by the word "peremptory." In addition, these notes reflect attention to the fact that this juror had indicated that a life sentence might be worse than death.

Also, the trial record reflects that at the end of voir dire Patrick told the court that he was "fine" with the jury and that his attorneys had consulted with him about the jurors.

After the evidentiary hearing, the postconviction court denied the claim, finding that Reres had chosen not to challenge the juror in question as part of a reasonable trial strategy. The postconviction court concluded, based on this Court's precedent, that choosing not to challenge a juror who is unfavorable for the guilt phase because the juror is favorable for the penalty phase is reasonable. The postconviction court noted Reres's testimony indicating that concern for the penalty phase was part of his strategy in not challenging this juror; recited testimony from Reres that, in any event, he thought this juror's bias would operate in favor of Patrick during the guilt phase; pointed out that Patrick said under oath at jury selection that his attorneys consulted with him about the jury and that he was "fine" with the jury; and observed that the juror comment in question contains wording consistent with second-degree murder, which is one of the lesser included offenses the defense argued for, where the alternative, manslaughter, was a "farfetched" theory in light of the "beating that the victim received in this case."

In addition, the postconviction court noted that Patrick had not called any expert to challenge Reres's testimony. As a result, the postconviction court further concluded that Patrick had failed to carry his burden to establish his claim.

**ANALYSIS**

To prove a claim of ineffective assistance of counsel, a defendant must establish two prongs, both of which are mixed questions of law and fact and were established in *Strickland*, 466 U.S. at 687:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*See also Bolin v. State*, 41 So. 3d 151, 155 (Fla. 2010); *Jacobs v. State*, 880 So. 2d 548, 555 (Fla. 2004). To prevail, the defendant must make both showings. *Strickland*, 466 U.S. at 687.

When a claim has been denied after an evidentiary hearing, the postconviction court's factual findings are reviewed for competent, substantial evidence, while its legal conclusions are reviewed de novo. *Bolin*, 41 So. 3d at 155. The ultimate conclusions as to whether a decision or omission by counsel constitutes deficient performance and whether a deficiency prejudiced the defendant are matters of law. *Patrick II*, 246 So. 3d at 260 (citing *Peterson v. State*, 221 So. 3d 571, 584 (Fla. 2017)).

In our consideration of the original denial of this claim, which was done without an evidentiary hearing, we concluded that Patrick had established the

prejudice prong of his claim, at least as a matter of pleading sufficiency. *See id.* at 263-64. We made that determination based on the *Carratelli* standard, which provides that a defendant establishes the prejudice prong of an ineffective assistance of counsel claim concerning failure to challenge a juror by showing from the face of the record that a person who was actually biased against the defendant sat on the defendant's jury. *Id.*; *Carratelli*, 961 So. 2d at 323-24. We adhere to the conclusion that the juror in question was actually biased against Patrick. The postconviction court did not conclude otherwise after the evidentiary hearing. However, contrary to Patrick's suggestion that the juror's bias, in itself, defeats any claim that the failure to challenge the juror was reasonable and strategic, the satisfaction of the prejudice prong does not end our inquiry.

An ineffective assistance of counsel claim has two prongs, even when it concerns juror bias. As noted above, in addition to showing prejudice, the defendant must show that his counsel's performance was deficient, meaning that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. In assessing this aspect of a claim of ineffective assistance of counsel, courts are to make "every effort . . . to eliminate the distorting effects of hindsight" and require the defendant to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689 (quoting

*Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  The Supreme Court has instructed courts to "keep in mind that counsel's function . . . is to make the adversarial testing process work in the particular case."  *Id.* at 690.

The defendant's task in proving deficiency is difficult by design.  *See Harrington v. Richter*, 562 U.S. 86, 105 (2011).  That is because deference is owed to the attorney who "observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge."  *Id.*  Counsel is entitled to even greater deference when he or she is highly experienced.  *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998).  If the standard were not designed this way, then "[a]n ineffective assistance of counsel claim [could] function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial" and would "threaten the integrity of the very adversary process the right to counsel is meant to serve."  *Harrington*, 562 U.S. at 105.

Part of the adversary process is jury selection.  Jury selection is a complex process.  From the perspective of the courts, the goal of this process is to seat an impartial jury, one that will assess the facts of the case dispassionately and apply the law to the facts objectively.  The parties to a particular proceeding, particularly those whose life and liberty are in jeopardy, may have a different goal in jury selection: naturally, the parties hope to seat a jury that will be predisposed to agree

- 13 -

with their theory of the case. The jury selection process is designed to allow both sides to interview the jurors, voice concerns, and stand up for their own interests as they assess them in light of their knowledge of the facts of the case and the experience they and their attorneys bring to the process.

We have previously recognized that an attorney's representation of his client's interests in a criminal case may sometimes include a determination that, although the juror is biased against the defense in some sense, overall, the juror is one whose participation may benefit the defendant's personal goals in the case. For example, in *Harvey v. Dugger*, 656 So. 2d 1253, 1256 (Fla. 1995), this Court expressly held that a juror who admits to not being impartial for the guilt phase can be seated as part of a reasonable trial strategy when the evidence of guilt is so strong that defense counsel concludes that there is "no chance of obtaining an acquittal" and the juror expresses defense-friendly views of the death penalty. *See also State v. Bright*, 200 So. 3d 710, 741-42 (Fla. 2016) (upholding a finding that counsel made a reasonable strategic decision not to challenge a juror who said she would think "a tiny bit" that the defendant was hiding something if he did not testify and counsel testified in a postconviction hearing that he probably decided not to strike the juror because she was "middle of the road" regarding the death penalty, albeit while also concluding that the juror was not actually biased); *cf. Peterson v. State*, 154 So. 3d 275, 282 (Fla. 2014) (noting, in the context of a claim

concerning the failure to exercise a peremptory strike, an attorney's testimony that "he has sometimes, including in the instant case, had to select jurors that were not favorable to the defense in the guilt phase, but were favorable in the penalty phase"); *accord Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1243-44 (11th Cir. 2011) (recognizing that an attorney may validly focus on the penalty phase of a capital trial over the guilt phase when there is overwhelming evidence of guilt and the defendant consents to the strategy); *Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992) ("Absent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel.").

Indeed, this recognition was implicit in our prior decision in this case, where we acknowledged that the juror in question had a bias against Patrick but declined to foreclose the possibility that he was kept on the jury as part of a reasonable trial strategy. *See Patrick II*, 246 So. 3d at 263-64. While Patrick's postconviction counsel argues that our prior decision rejected the notion that this juror was in any way favorable to Patrick, we disagree. In fact, we explicitly noted that "the record in this case suggests possible strategic grounds, relating to both phases of the trial, for not striking this juror." *See id.* at 264.

By arguing that we have already rejected any finding that this juror could have been favorable to Patrick's case, Patrick is essentially claiming that a finding

of prejudice under *Carratelli* dictates a finding of constitutionally deficient performance. On the contrary, in *Carratelli*, we explicitly stated that our decision addressed "only the requirements for establishing prejudice under *Strickland*" and that "we need not address the requirements for meeting *Strickland*'s first prong—deficient performance." 961 So. 2d at 327.

In consideration of the foregoing precedent and analysis, we conclude that the dispositive questions before this Court are (1) whether the postconviction court's factual finding that the juror at issue was seated as part of a trial strategy is supported by competent, substantial evidence and, if so, (2) whether the bias at issue was so strong as to render the claimed strategy objectively unreasonable under the specific facts of this case.

*A. Competent, Substantial Evidence Supports the Finding of Strategy*

Here, the postconviction court found, based on the testimony of Reres, which the court characterized as "candid and credible," that the decision to seat the juror at issue was a strategic one. Reres's testimony provides competent, substantial evidence to support that finding. We also accept the postconviction court's alternative finding that Patrick failed to carry his burden to show that the seating of the juror in question was not strategic, as the only witnesses who testified at the hearing supported a contrary conclusion—that the decision was a reasonable strategic choice.

Reres testified that the juror at issue was favorable for the defendant in the penalty phase given his statements about the death penalty versus a life sentence and his evolving view during the course of jury selection. While Reres acknowledged that this juror was better for the defense in the penalty phase than in the guilt phase, he also stated that for the guilt phase he would have been looking for jurors who "would be predisposed to listen carefully to" the defense theory that the killing was done, not with premeditation or during the commission of a felony, but simply in a rage in response to Schumacher's repeated sexual advances. Reres's stated belief that this juror's bias would have favored his defense theory is not unreasonable, and was accepted by the postconviction court as credible.

Furthermore, although Reres testified that he did not have a specific recollection of the juror at issue or his own thought process at the time of trial, a specific recollection is not necessary to support a finding that the attorney was indeed employing a specific strategy. *Cf. Monlyn v. State*, 894 So. 2d 832, 837 (Fla. 2004) (upholding a finding that an attorney advised his client of the right to testify based on the attorney's certainty that he did in light of his standard practice, developed over the course of twenty years). The attorney's confident testimony about what his thought process must have been is sufficient when that testimony is based on extensive trial practice. *Cf. id.*; *Harvey*, 629 F.3d at 1245 (opining that, because it is the defendant's burden to prove a claim of ineffective assistance,

- 17 -

lapses in counsel's memory should not be weighed in favor of the defendant).

Reres's testimony in the instant case is, therefore, competent, substantial evidence to support a finding of what his strategy was at the time of trial, despite his admitted lack of a specific memory of his thought process at the time of trial.

Although Patrick correctly points out that some of Rere's testimony at the evidentiary hearing was equivocal or inconsistent with the record, that observation does not defeat the postconviction court's findings.[3]  It was within the province of the postconviction court, as the trier of fact, to weigh Reres's testimony and accept parts of it as accurate and credible even if other parts were less accurate and credible.  *See Porter v. State*, 788 So. 2d 917, 923 (Fla. 2001) ("[T]his Court will not substitute its judgment for that of the postconviction court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence by the trial court."); *cf. also Wynne v. Adside*, 163 So. 2d 760, 763 (Fla. 1st DCA 1964) (explaining that a jury, as the trier of fact, "may believe a part of a witness' testimony and disbelieve other parts of his testimony").  Reres's testimony was sufficient to support the postconviction court's finding that Reres

---

3. One example of an inconsistency with the record is that Reres would not agree that it was important for the jury to believe Patrick's statement to the police, even though he had argued in closing that Patrick was honest and candid and the main facts supporting the theory of second-degree murder came from that statement.

had a strategic basis for not challenging the juror in question, and his testimony does not contradict the record as to the salient points driving that finding.

For the foregoing reasons, the postconviction court's finding that Reres had a strategic reason not to challenge the juror in question is supported by competent, substantial evidence, and the postconviction court's finding that Patrick failed to carry his burden to show otherwise is also supported by the record. Patrick's challenge to that finding is an attempt to have this Court reweigh the evidence, which we will not do. *See Porter*, 788 So. 2d at 923.

### *B. Reres's Strategy was Not Objectively Unreasonable*

We also conclude that Reres's strategy was not objectively unreasonable from the perspective of a defense attorney, whose role is to protect his or her client's personal interests in the case within the bounds of the rules of professional conduct. Reres's belief that the juror in question would serve Patrick's personal interests in the trial was objectively reasonable.

Specifically, it was logical for Reres to believe that the juror's bias created a higher probability that he, as compared to other potential jurors, would return a verdict of a lesser degree of murder and that, if the jury convicted Patrick of first-degree murder, this juror was more likely than other potential jurors to recommend a life sentence. We note, too, that Patrick was actively and intelligently involved in the jury selection, as reflected by Reres's testimony and his contemporaneous

notes, as well as the testimony of Ferraro; that Reres testified that he would have discussed all the issues that came up at the postconviction evidentiary hearing with Patrick at the time of jury selection if Patrick had said he wanted to strike this juror; and that Patrick advised the trial court at the end of jury selection that he was "fine" with the panel and had discussed it with his attorneys. Because the seating of the juror in question was part of a reasonable strategy that Reres implemented to serve Patrick's interests in this trial, it cannot be said that Reres "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," which is the concern of *Strickland*'s performance prong. 466 U.S. at 687.

## CONCLUSION

Ultimately, because competent, substantial evidence supports the postconviction court's finding that Reres made a strategic decision not to challenge the juror at issue, and because this strategy was objectively reasonable from the perspective of believing that it would operate to Patrick's advantage in this particular trial, we affirm the denial of postconviction relief.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, and MUÑIZ, JJ., concur.
COURIEL, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Broward County,
    Ilona Maxine Holmes, Judge - Case No. 062005CF016477A88810

Neal A. Dupree, Capital Collateral Regional Counsel, and Suzanne Myers Keffer, Chief Assistant Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

    for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Lisa-Marie Lerner, Assistant Attorney General, West Palm Beach, Florida,

    for Appellee